Argued and submitted April 7, 1987, decision of Court of Appeals affirmed, judgment of trial court affirmed in part and reversed in part and case remanded to trial court April 12, 1988

## CHESTERMAN,
*Respondent on Review,*

*v.*

## BARMON,
*Defendant,*

## CONSTRUCTION 80, INC.,
*Petitioner on Review.*

(No. 82-0538C; CA A35388; SC S33475)

753 P2d 404

440

Thomas M. Christ, Portland, argued the cause for petitioner on review. With him on the petition was Mitchell, Lang & Smith, Portland.

Lawrence Matasar, Portland, argued the cause for respondent on review. Also on the response to the petition for review was Hoffman, Matasar & Glaeser, Portland.

CARSON, J.

Peterson, C. J., concurred and filed an opinion in which Lent, J., joined.

Jones, J., dissented and filed an opinion in which Campbell, J., joined.

## CARSON, J.

This case concerns the doctrine of *respondeat superior.* The question presented is whether a corporation may be held vicariously liable for an injury to a third party which results from an employee's taking a drug.

The case comes before us for review of the trial court's grant of summary judgment for defendant Construction 80, Inc. (the corporation). On review, our task is not to decide whether the employee was negligent or, if he were negligent, whether the corporation is liable under the doctrine of *respondeat superior.* Our only task is to decide whether, on the record before the trial court on the motion for summary judgment, that court could decide as a matter of law that the corporation could not be held vicariously liable for the employee's actions. *See Seeborg v. General Motors Corporation,* 284 Or 695, 699, 588 P2d 1100 (1978). On the record before the trial court, plaintiff at trial might argue and a jury could find the following:

Barmon was both an employee and president of the corporation. He met with potential customers at their house on the evening of April 7, 1981, to formulate plans and to obtain information for a remodeling project. After finishing his inspection of the property, Barmon took a pill described as "chocolate mescaline"[1] while still on the property of the potential customers of the corporation. He took the drug to counter feelings of depression and to give him enough energy to drive to his boat to work on preparing a bid for the remodeling project. Working at his boat was a normal practice for Barmon. After telephoning his wife to tell her that he was going to the boat, Barmon set out in his truck.

While driving, Barmon began to hallucinate. He stopped near a house where he believed a former friend once lived. In fact, however, it was plaintiff's house. Barmon entered the house, broke into plaintiff's locked bedroom, and sexually assaulted plaintiff.

---

[1] The record is unclear on what drug Barmon took. The pill apparently contained, at least in part, some kind of hallucinogen. For this opinion, we shall simply refer to the drug which Barmon took as "the drug."

Plaintiff brought this action against Barmon, the corporation, and another construction company with which Barmon had been involved. Plaintiff asserted, *inter alia,* that the corporation was negligent in retaining Barmon as an employee and that the corporation was vicariously liable for Barmon's actions on the theory of *respondeat superior.* The trial court granted the corporation's motion for summary judgment on all claims. Although other parties remained in the action, the judgment for the corporation was a final judgment, in compliance with ORCP 67 B.

The Court of Appeals affirmed the summary judgment on the negligent retention claim. *Chesterman v. Barmon,* 82 Or App 1, 4-5, 727 P2d 130 (1986). The court, however, reversed on claims based upon *respondeat superior,* finding triable issues of fact on whether Barmon was within the scope of employment in taking the drug.[2]

## I.   The Doctrine of *Respondeat Superior.*

■       Under the doctrine of *respondeat superior,* an employer is liable for an employee's torts when the employee acts within the scope of employment. *Stanfield v. Laccoarce,* 284 Or 651, 654, 588 P2d 1271 (1978). Negligence or other tortious conduct by the *employer* is not required. Plaintiff alleges that either the act of ingesting the drug or the acts of entering her house and assaulting her were tortious acts committed within the scope of employment.

■       Three requirements must be met to conclude that an employee was acting within the scope of employment. These requirements traditionally have been stated as: (1) whether the act occurred substantially within the time and space limits authorized by the employment; (2) whether the employee was motivated, at least partially, by a purpose to serve the employer; and (3) whether the act is of a kind which the employee was hired to perform. *Stanfield v. Laccoarce, supra,* 284 Or at 655; *Gossett v. Simonson,* 243 Or 16, 24, 411 P2d 277 (1966).

---

[2] Neither the petition for review nor the response to the petition raised the issue of summary judgment on the negligent-retention theory. We are not required to address that issue. Although we may address any issue raised to the Court of Appeals, we choose not to address any issue in this case not raised in the petition or the response. ORAP 10.15(2).

## II.  Acts of Entering Plaintiff's House and Assaulting Her.

Applying the foregoing requirements to this case, Barmon's acts of entering plaintiff's house and sexually assaulting plaintiff were, as a matter of law, outside the scope of employment. They were outside the authorized limits of time and space, were not motivated by a purpose to serve the employer and were not of a kind which Barmon was hired to perform.

Consequently, if plaintiff had attempted to premise the corporation's vicarious liability *solely* on Barmon's acts of entry and assault, the corporation would not be vicariously liable. The corporation still may be found vicariously liable, however, if *other* acts which were within Barmon's scope of employment resulted in the acts which led to injury to plaintiff. Plaintiff has premised vicarious liability on such other conduct — Barmon's taking the drug. She contends that the taking of the drug was within the scope of employment and that the taking of the drug resulted in her injury.

## III.  Act of Ingesting the Drug.

When Barmon took the drug, he was on the property of potential customers of the corporation. He intended to leave the property to go to his boat to continue work on the bid for the remodeling project. This was the usual pattern of Barmon's work for the corporation and is some evidence that Barmon was acting within authorized time and space limits. There also is some evidence that Barmon ingested the drug to enable him to perform work for the corporation and thus was motivated by a purpose to serve the corporation.

Under the somewhat unusual facts of Barmon's dual relationship to the corporation, a jury might find that Barmon was authorized by the corporation's management to take the drug. Barmon was both president and employee of the corporation. As president, he was broadly charged with responsibility for the corporation's operations. A jury might find that Barmon, in his role as president, had authority to take steps enabling his continued work on the project for the corporation, even to the extent of ingesting a drug.

We conclude that plaintiff has presented sufficient

evidence of a claim of *respondeat superior* and that the corporation was not entitled to summary judgment on that claim. On remand, two questions are presented for the jury's consideration. The first is whether plaintiff's injuries resulted from Barmon's alleged negligence in taking the drug. The jury could find that Barmon's breaking into the house and assaulting plaintiff were acts which resulted from Barmon's taking the drug.[3] If Barmon's taking the drug did result in plaintiff's injuries, it is then a question for the jury whether the taking of the drug was within the scope of employment.

■     Our decision today might be understood as being at odds with certain of this court's earlier decisions on *respondeat superior. See Chesterman v. Barmon,* 82 Or App 1, 6 n 2, 727 P2d 130 (1986). In those decisions, this court determined whether *respondeat superior* applied as of the time that the injury occurred. *Stroud v. Denny's Restaurant,* 271 Or 430, 437, 532 P2d 790 (1975); *Heide/Parker v. T.C.I., Incorporated,* 264 Or 535, 545-46, 506 P2d 486 (1973); *Fogelsong v. Jarman,* 168 Or 177, 183, 121 P2d 924 (1942). Although appropriate in most cases, the rule is inappropriate where, as here, there is a "time-lag" between the act allegedly producing the harm and the resulting harm. The focus should be on the *act* on which vicarious liability is based and not on when the act results in *injury.*[4]

The decision of the Court of Appeals is affirmed. The judgment of the trial court is affirmed in part and reversed in part. The case is remanded to the trial court for proceedings consistent with this opinion.

**PETERSON, C. J.,** concurring.

It stretches comprehension to believe that any corporation would authorize an employee to ingest chocolate mescaline to "give [the employee] enough energy to * * * work on

---

[3] The dissent does not challenge our analysis on the issue presented by the motion for summary judgment: *Respondeat superior.* Instead, the dissent would hold, as a matter of law, that Barmon himself could not be found liable.

There was evidence that Barmon ingested a substance about which he knew little, other than that it might stimulate him strongly enough to continue working. Barmon previously had taken an hallucinogen and undergone a radically disorienting experience. Even if the issue which the dissent addresses were before us, the dissent's proposed resolution is incorrect.

[4] For an interesting discussion of the problem, see *Dickinson v. Edwards,* 105 Wash 2d 457, 716 P2d 814 (1986).

preparing a bid for the remodeling project." 305 Or at 441 (1988). But corporations, though incorporeal, are created by and operated by human beings, humans often do strange, incomprehensible deeds, and therefore corporations can, as well. I concur with the majority without reservation, but write separately to state why I concur.

ORS 60.301 states that "[a]ll corporate powers shall be exercised by or under the authority of, and the business and the affairs of the corporation managed under the direction of, the board of directors * * *." In every corporation, there must be a real person or persons (at some level of management) that act as the mind exercising the discretion of the corporation.

Viewing the pleadings, affidavits and exhibits in the light most favorable to the plaintiff, this is a case in which a real person was the sole promoter of the corporation, the president of the corporation, the sole person acting in a management capacity in terms of preparing and placing bids for construction jobs and deploying the necessary employees to carry out the work and the person that committed the tortious act. It is undisputed that Barmon's knowledge was the corporation's knowledge. We do not have before us the traditional *respondeat superior* situation in which the questions are (1) whether a tortious act by a subordinate employee was within the time and space limits authorized by the corporation's policymaking or management employees, (2) whether the subordinate employee was motivated, at least in part, by a purpose to serve the employer, and (3) whether the act of the subordinate was of a kind which the employer's policymaking or management employees hired the subordinate employee to perform.

In *Johnson v. Alabama Fuel and Iron Co.*, 166 Ala 534, 52 So 312 (1910), the general manager of a coal mine (operated by the defendant corporation) "arrested plaintiff's intestate," who was living in a tent near the mine, and later shot him to death. The plaintiff sought to hold the corporation liable for the acts of its general manager. The court held that the corporation was not liable, stating:

"We find in these facts no warrant for the inference that the murder of plaintiff's intestate was accomplished by [the general manager] while in the execution of his agency. Nor is the controlling principle, or its application to the facts, affected

by the consideration that Adams was a vice principal for the defendant corporation, if it be a fact that he was a vice principal. Corporations may, and often do, create vice principals, who in their general management of the corporate business so partake of the corporate entity that their acts have the same effect upon corporate responsibility as if done or expressly authorized by the governing board or stockholders, and so corporations may become responsible in cases for the indictable crimes of their agents. But this does not impair the doctrine that the corporation is bound only when its vice principal acts, however improperly, negligently, or maliciously, in the execution of corporate functions. When he steps wholly aside from his authority, and does an act to gratify personal malignity, or to accomplish some other purpose personal to himself and having no relation to the business of the corporation, as, for aught appearing to the contrary, was the case here, the corporate master is no longer responsible."

*Id.* at 536-37, 52 So at 313, *quoted with approval in* 10 Fletcher Cyc Corp 325-26, § 4877 (Perm ed 1986).

In *Fields v. Lancaster Cotton Mills,* 77 SC 546, 58 SE 608 (1907), a corporation was held liable when the superintendent of a cotton mill directed and participated in the assault of one who sought to lure cotton mill employees to other jobs. The court held that Lancaster Cotton Mills was liable for the acts of the superintendent because he was entrusted with the control of its policies and the methods to be employed to prevent interference with its employees:

"The superintendent of a cotton mill is usually the representative of the mill with respect to the hiring and management of its operatives, and other features of its mechanical operations. The evidence on the part of the defendant shows the superintendent, in this instance, was intrusted with the control of its policy and the methods to be employed to prevent interference with the operatives. The Lancaster Cotton Mill cannot, therefore, escape the liability to third persons for any actions taken by him with respect to the matters it had placed under his control. It makes no difference that the action was unlawful and that it would not have been sanctioned by the corporation itself."

*Id.* at 549, 58 SE at 609.

Although the foregoing cases are not sole-shareholder cases, they state the premise that the corporation is liable for

the acts of one entrusted with the control of the company policy if the act was in the execution of a corporate function. Conversely, the corporation is not liable if the employee's act is unrelated to any corporate purpose. Newer cases reflect the concept that by giving one powers of management, the corporation "must be held to have invested him with authority to make decisions for it, when necessary, in connection with the performance of those duties. When made, the [employee's] judgment becomes the judgment of the defendant." *Panjwani v. Star Service & Petroleum Company,* 395 SW2d 129, 132 (Mo 1965) (quoting *Bova v. St. Louis Public Service Co.,* 316 SW2d 140, 144 (Mo App 1958) (holding corporation vicariously liable for assault on customer by assistant manager "as customer was engaged in trying to settle a controversy concerning a portion of defendant's business").

*Cornell v. Albuquerque Chemical Co., Inc.,* 92 NM 121, 584 P2d 168 (NM Ct App 1978), is to that effect. In that case the vice president of the defendant corporation ran the corporation along with family members who were corporate officers. The vice president, along with another corporate employee, wrongfully repossessed a chemical sprayer and resold it. The court stated that the vice president's acts "were the acts of the corporation" in light of evidence that the vice president

> "bought and sold used equipment, managed the employees, hired and fired them, signed the checks * * * and [performed all] of the duties necessary to running the business. He was in charge of the day-to-day functions of the business. * * * It was a family corporation with [the vice president] as the one man who 'wielded the executive power of the corporation.' He was authorized to commit these acts."

*Id.* at 126, 584 P2d at 173.

Barmon is in a like position here. Summary judgment in favor of the corporate employer was therefore improper. At some future time we may have to determine whether vicarious corporate liability may result when a corporate manager without authority to make policy but with authority to exercise supervision with respect to the manner in which the duties of other corporate employees are carried out or fulfilled authorizes a subordinate employee to take a drug to "better" perform work for the employer. This is not that case. Here the person

charged with making company policy committed the act that is claimed to be tortious. I therefore concur.

Lent, J., joins in this concurring opinion.

**JONES, J.,** dissenting.

I dissent.

Plaintiff brought this personal injury action, alleging liability of Construction 80, Inc. (defendant), for negligent retention of its sole employee (Barmon) and vicarious liability for Barmon's actions. Defendant moved for summary judgment on *all* issues, which the trial court granted. Plaintiff appealed to the Court of Appeals, which concluded as a matter of law that the trial court was correct in granting defendant's motion for summary judgment on the negligent retention claim. *Chesterman v. Barmon,* 82 Or App 1, 727 P2d 130 (1986). Plaintiff did not cross-appeal, and that issue is not before us. The remaining issue before us is, if the employer is without fault, does the doctrine of *respondeat superior* justify denial of the motion for summary judgment as to plaintiff's remaining negligence claims? Plaintiff sets forth in her response to the petition for review:

> "The complaint filed by the plaintiff alleges that the defendant was negligent in two particulars, (1) taking illegal drugs, 'when he knew or should have known it would affect his behavior', and (2) entering plaintiff's home after he took the drugs 'when he knew or should have known he would be unable to control his behavior or accurately perceive that he was subjecting the plaintiff to harmful conduct.' "

The Court of Appeals concluded that the trial court erred in granting defendant's motion for summary judgment on these vicarious liability claims because "a reasonable jury could infer from Barmon's testimony that he was motivated to take the drug, at least in part, by a purpose to serve the employer by staying up to finish the bid" and that the causation question was clearly one for the jury. I disagree. The Court of Appeals misinterpreted the record in this case.

The majority opinion asserts that

> "our task is not to decide whether the employee was negligent or, if he were negligent, whether the corporation is liable under the doctrine of *respondeat superior.* Our only task is to decide whether, on the record before the trial court on the

motion for summary judgment, that court could decide as a matter of law that the corporation could not be held vicariously liable for the employee's actions. * * *" 305 Or at 441.

Despite the majority's disclaimer, this court should examine the question of the employee's negligence, insofar as that negligence is an indispensable element of the employer's liability under *respondeat superior*. As this court has said previously, and as the majority repeats, "[u]nder the doctrine of respondeat superior, an employer is liable for the *torts* of his employee when the employee is acting within the scope of his employment." *Stanfield v. Laccoarce*, 284 Or 651, 654, 588 P2d 1271 (1978) (emphasis added). In addition to the necessary element of the employee acting within the scope of employment, it is obvious from this formulation of the doctrine of *respondeat superior* that the employee must have committed a tortious act.

The doctrine of *respondeat superior* is not an independent cause of action.

"The foundation of the action is still negligence, or other fault, * * * all the law has done is to broaden the liability for that fault by imposing it upon an additional, albeit innocent, defendant. It is still an action for negligence, and the ordinary rules of negligence liability are still applied to it." Keeton, Prosser and Keeton on Torts 499 (5th ed 1984).

In considering whether the court should grant a motion for summary judgment, the trial court should look to all the record — all the record *as it is then before the court*. The basis for plaintiff's claim lies in plaintiff's allegations. Ultimately, if plaintiff is to prevail it must be because plaintiff has produced evidence to support the allegations in the complaint necessary to make a cause of action. This same requirement is a part of the test applied to a motion for summary judgment. "All defendants have to show is that the admitted factual posture of the case is such that plaintiff would not be entitled to a jury determination." *Seeborg v. General Motors Corporation*, 284 Or 695, 701, 588 P2d 1100 (1978).

Applying these principles to the present case as it was before the court at the time that the court decided the motion for summary judgment, it follows that plaintiff's allegations of Barmon's negligence were a necessary part of plaintiff's claim

against defendant. If the factual posture of the case as constructed by plaintiff would not allow a jury verdict on the question of the employee's tortious action, as alleged by the plaintiff, then defendant should prevail on the motion for summary judgment. In the present case the facts are insufficient to establish the negligence alleged by plaintiff.

Summary judgments are evaluated by pleadings, affidavits and other "evidence" offered in the form of exhibits. In this case the "evidence" consists of exhibits offered by plaintiff to support her opposition to defendant's motion for summary judgment, including a transcript of Mr. and Mrs. Barmon's testimony given during Harry Barmon's criminal trial for burglary, rape and sexual abuse. No other exhibits were offered concerning Barmon's knowledge of the effects of the drugs or motivation for his actions. The exhibits simply fail to produce any evidence to back up the single remaining allegation in plaintiff's complaint, to wit: "Ingesting LSD when he knew or should have known it would affect his behavior."[1]

Barmon testified at the trial:

"Gary [Barmon's electrician] told me about these chocolate mescaline he had taken at a party, and he said it just made him giggle, and they were drinking beer. I said, 'Isn't that kind of dangerous, drugs and beer?' He said, 'Oh, no. It was a kick.' He felt elevated, and he felt very great. * * * [H]e knew I was really down. It seemed like it was prolonged forever and going on and on and on and having to answer to all of the people I worked with, and they said, 'When are you going to see money? When is this going to come to court?' I didn't have any idea it would take a year and a half, and Gary knew I was down and told me about the — these chocolate mescaline. In fact, he had some with him, and he gave me four of them at that time. He also gave me some little pink pills. He said that these will give you pep to get you through the day.

"They were pink, heart-shaped pills that he called 'speed.' I took the pink pills, and they gave me energy to get through the day, and then I was just totally exhausted. I kind of was

---

[1] No one on this court believes that plaintiff's second allegation of negligence is backed by the record:

"2. Entering plaintiff's home after ingesting the LSD when he knew or should have known he would be unable to control his behavior or accurately perceive that he was subjecting the plaintiff to harmful conduct."

the person who kind of was pushing the crew to get them to produce and tell them what to do, and as I said, I was more depressed, and I wasn't pushing very hard, and the guys were coming about to a standstill. Things were really slowing down. When I took the speed, productivity seemed to pick up, and all it did is it seemed like it gave me some energy, and so I took a few of those, and then I went down, and I got my hair cut, and I was cautious about the chocolate mescaline because I don't know — I didn't know about the stuff. So I asked John, my barber, 'What do you know about these things?' He said that — I said, 'They are chocolate mescaline. Have you ever had it?' He said, 'Yes, he had mescaline before.'

"I faked taking one of them, and I dropped it down the sink, and John put one in his mouth, and I was going to observe what happened to him, but just — this is just after I got in there, and he was cutting somebody else's hair * * *.

"What I was going to observe was to see what John's feedback was on it, but I had to leave before — it didn't have any effect. *I said, 'Do you feel it?' And he said, 'No.' I left there not knowing what the effect was.*" (Emphasis added.)

The transcript reveals that on the evening in question Barmon took the pills to ward off "dropping in this depression," which was described as a "let-down feeling, tension" brought about by trying to get a construction bid together. He testified:

"I was there for a long time working up plans and drawing them sketches. I drew a floorplan for them, and I remember I was really working hard. I was putting out everything that I had. I was really trying to sell my expertise and my credibility and hoping that that would open the door so I would have a good chance when I made my presentation, the facts, and figures that they would go with me.

"Work by then was getting — slacking off. The boom was no longer going, and Lexington Construction was no longer an entity, and I had started another construction company after this, and — Construction '80, and I really wanted the job. I remember working very hard at it, and I left the house, and I felt like I had almost overstayed my visit. I must have been there — maybe I didn't. It was 10:30, 11:00. I am guessing it was somewhere in that vicinity, and it was kind of a let-down feeling, tension, and everything when I got outside of there, outside of their house, and I was taking some notes about side-yard access, what kind of piece of equipment I could get in, and I noticed that there was a fence that — a section of fence I

could remove that would be fairly easy. I just took a few notes, and then I started feeling very down.

"Dr. Forman was going through my mind, and I started dropping in this depression, and it was really imperative that I stay with this bid and get my figures together, and I wound up taking out the pills, and I get one of them, and it was just kind of like a little necessary quick couple of crunches, and it was gone.

"Q   *That was the chocolate mescaline?*

"A   *Yes."* (Emphasis added.)

Plaintiff concedes that her complaint is based upon an allegation that Barmon knew or should have known that taking the alleged illegal drugs would affect his behavior. The record clearly demonstrates that he did not know, nor is there *any* evidence from which he should have known, what the effect of the "drugs" would be. As a matter of fact, he thought he was taking chocolate mescaline but actually took LSD. He was not charged with recklessness in not knowing what drug he took. Previously, Barmon had a reaction to ingesting mushrooms and had been pepped up by speed, but there is not one iota of evidence that Barmon knew or should have known what the effect of either chocolate mescaline or LSD would be. Psychedelic mushrooms are not the same as mescaline, a cactus derivative, and speed (an amphetamine) is not the same as LSD. The majority ignores the fact that a specific drug was alleged to have been ingested and it appears to lump all these remarkably different drugs into one category. The majority footnotes that it is unable to tell from the record what drug Barmon ingested. If he did not know what drug he took, be it aspirin, heroin, speed, a sleeping pill, etc., how can he possibly be charged with knowing it, whatever it was, would affect his behavior?

On the date in issue, Barmon's first reaction to the drug he ingested began when he started to experience "bright lights, flashing, and a feeling that eyeballs are constantly watching him" while he was driving to a house he formerly owned, a destination totally unrelated to any work activity. There is no lay or expert evidence that raises a fact issue that Barmon ever before hallucinated from taking either LSD or chocolate mescaline, nor is there any evidence from any source that defendant, viewed subjectively or objectively, had

or should have heard, read or been warned about the bizarre effects of either of these drugs. There is no evidence that it was reasonably foreseeable that when Barmon took what he thought was mescaline it could result in his committing rape and sexually abusing a stranger. Plaintiff suggests that:

> "It is appropriate for this Court, as a policy matter, to consider the dangerousness of drug use as a factor in determining liability. *See., e.g., DiCosala v. Kay,* 91 NJ 159, 450 A2d 508 (1981), which applied a less strict test for foreseeability because the harm was the result of the use of a gun, which the court called a 'dangerous instrumentality,' 450 A2d at 519, and an 'enhanced hazard.' 450 A2d 520. *See also,* Restatement (Second) Torts § 307, 'It is negligence to use an instrumentality, whether a human being or a thing, which the actor knows or should know to be so incompetent, inappropriate, or defective that its use involves an unreasonable risk of harm to others.' "

We should decline plaintiff's invitation. We cannot take judicial notice what people should know about the effect of these drugs. We cannot supplement the record with our own suppositions. Plaintiff selected the words for her pleading. She alleged Barmon was negligent or reckless in ingesting LSD when he knew or should have known *it* would affect his behavior. There is some question, but there is sufficient evidence to submit to a jury that defendant indeed mistakenly ingested LSD, but there is no evidence that he knew he ingested LSD. Further, there is nothing in the record to support the allegation that defendant knew or should have known that ingesting the LSD could result in such aberrant behavior as rape and sexual abuse. As stated, he did not know he ingested LSD. If he did not know that he took LSD, how could he know or should have known that it would affect his behavior? Even if we construe plaintiff's pleading in a most liberal fashion in order to conform the pleading to the "evidence," we might convert the allegation to "he ingested LSD believing it was chocolate mescaline." But Barmon admitted he did not know what, if any, behavior chocolate mescaline would produce. Certainly we are not experts on what people should or should not know about the effects of taking chocolate mescaline. Certainly there is no evidence that Barmon or anyone should have known that ingesting small amounts of chocolate mescaline would possibly affect his behavior to a degree where he would rape and sexually abuse someone. I doubt that there

is any literature or study that would inform Barmon or anyone else that such behavior should be a foreseeable result of taking chocolate mescaline. The *Fazzolari* trilogy[2] on foreseeability has to stop somewhere. This is an appropriate case to say that Barmon's aberrant conduct was not foreseeable as a matter of law.

Defendant, being the moving party, had an obligation to show from the record that Barmon did not know or had no reason to know that the ingestion of either LSD or chocolate mescaline would affect Barmon's behavior in some foreseeable fashion. The defendant has done this.

In *Fazzolari v. Portland School Dist. No. 1J,* 303 Or 1, 17, 734 P2d 1326 (1987), Linde, J., wrote:

> "[T]he issue of liability for harm actually resulting from defendant's conduct properly depends on whether that conduct unreasonably created a foreseeable risk to a protected interest of the kinds of harm that befell the plaintiff. The role of the court is what it ordinarily is in cases involving the evaluation of particular situations under broad and precise standards: to determine whether upon the facts alleged or the evidence presented no reasonable factfinder could decide one or more elements of liability for one or the other party. * * *"

Dissecting this formulation, the harm must be a foreseeable result of defendant's conduct. Barmon's ultimate aberrant conduct is certainly graphic, but there must be a nexus between the alleged conduct and the ultimate harm. That nexus is that the conduct in ingesting the drug unreasonably created a foreseeable risk to a protected interest (the plaintiff's right of personal integrity) of the kinds of harm that befell the plaintiff. Aside from the mismatch of pleading and proof as outlined above, a prime issue still remains: was the harm foreseeable?

In the *Fazzolari* trilogy, this court strove valiantly to reject the legal cliche of "duty" and substituted the legal word "foreseeability." But, if misapplied, "foreseeability" gives lawyers and judges no better guidance than we had before. The substitution of one legal word for another which is just as

---

[2] *Fazzolari v. Portland School Dist. No. 1J,* 303 Or 1, 734 P2d 1326 (1987); *Kimbler v. Stillwell,* 303 Or 23, 734 P2d 1344 (1987); *Donaca v. Curry Co.,* 303 Or 30, 734 P2d 1339 (1987).

likely to prevent an examination of the facts of each case is not what we had in mind. *See Dahl v. BMW,* 304 Or 558, 564, 748 P2d 77 (1988).

In *Donaca v. Curry Co.,* 303 Or 30, 33-34, 734 P2d 1339 (1987), this court quoted from Prosser, Pfalsgraf *Revisited,* 52 Mich L Rev 1, 15 (1953), that "[d]uty is only a word with which we state our conclusion that there is or is not a liability; it necessarily begs the essential question." But isn't "foreseeability," if misapplied, a word that does exactly the same thing? In a summary judgment context, foreseeability creates a question of law whether or not to submit an empirical fact pattern to a trier of fact.

Tort law is weighted down with legal words that are most difficult to explain. Even before this case reached us, the Court of Appeals, with absolutely no analysis, states that the issue of causation is clearly for the jury. However, the causation in this case is not so simplistic. The majority's resolution of this case mirrors the Court of Appeals' in that it too illustrates the problems associated with allowing a legal formula to be substituted for real legal analysis of the facts. The majority and concurring opinions struggle with the phrase *respondeat superior,* trying to separate the inseparable in a case such as this when an employee is his own employer and vice versa. In doing so, the majority ignores the reasonable-person test as to what an individual objectively or subjectively knows or should know about the effect of mind-altering drugs. Even to reach the causation issue, the majority resorts gratuitously to amending the plaintiff's complaint for the first time on appeal (ignoring statutory pleading and practice set forth in ORCP 23) and assumes foreseeability without mentioning it as a conduit in its effort to dump whatever fact issue might be in the case into the lap of some future jury.

The intent of the *Fazzolari* trilogy was to encourage courts and juries to examine each case on its own facts rather than having a court apply the Procrustean bed of "the law" to avoid the facts. We should follow that same purpose here, even if it leads to a summary judgment rather than a jury trial. The facts of this particular case should not be stretched to fit into the majority's idea of what would make a sufficient case for the jury.

The majority seems to be saying that the taking of

any hallucinogenic drug (which need not be identified) that predictably will alter behavior, no matter how aberrant that behavior may be, raises a fact issue of foreseeability. What special insight or information do the judges joining the majority possess that leads them to such an unsupported conclusion? Is the majority taking judicial notice of the foreseeability of the taking of any hallucinogenic drug? If so, it has at least some responsibility to spell out upon what physiological, psychological or scientific study it bases its conclusion. The majority cannot rely on the record. The summary judgment evidence closet is bare on this issue. Appellate judges simply cannot, via *ipse dixit,* create knowledge of such matters out of intuition. I suggest that that is exactly what the majority has done, apparently saying, "we have an intuitive belief that, if a person takes any hallucinogenic drug knowing that the drug will alter behavior to some degree a question of foreseeability for a jury arises as to *any* resulting harm."

I shudder to think of the task that the majority has foisted back on a trial judge on remand of this case. First, the trial judge must address the pleading question. Plaintiff's allegation as it stands would survive an ORCP 21A. motion. There is nothing wrong with the allegation, but, as iterated and reiterated, plaintiff's evidence does not match the allegation. Therefore, the trial judge must allow an amendment to the pleadings for the case to make any possible sense to the jury. This the judge should do. ORCP 23B.

Let us assume that the plaintiff is allowed to amend her allegation to read that Barmon "took an hallucinogenic drug when he knew the drug would affect his behavior." Then the trial judge must instruct the jury that, in order for Construction 80 to be held responsible, the plaintiff must prove by a preponderance of the evidence that Barmon must have taken the drug in the course of his employment to promote the business interest of the company. Further, the judge must instruct the jury that it must find on the causation issue that Barmon was still under the influence of the hallucinogenic drug when he committed the sexual assault. Finally, the trial judge must instruct the jury that it must find by a preponderance of the evidence that when Barmon took the hallucinogenic drug that he knew or should have known that, by ingesting the drug, a reasonable person should reasonably foresee the type of harm done to plaintiff.

Now comes the challenge — how is the trial judge to define foreseeability to the jury. Does simply mentioning the word discharge the court's responsibility? Should the question be whether a reasonable person could foresee the chain of events culminating in plaintiff's damage? If so, what proof can plaintiff possibly present to the jury that will bridge the foreseeability gap between ingesting an unknown hallucinogenic drug and the conduct of raping and sexually assaulting plaintiff? That chain has a gaping hole in it at this time at the summary judgment level and it is most difficult to perceive how that hole can be plugged with any form of evidence at trial. If it isn't, the trial judge has no business submitting the foreseeability issue to the jury, which brings me to my conclusion.

The defendant corporation challenged the foreseeability issue, and the Court of Appeals recognized that issue, stating, "We have to determine whether there are triable issues of fact about whether Barmon's ingesting the hallucinogenic matter was within the scope of his employment and *was part of the chain of causation that led to plaintiff's injury." Chesterman v. Barmon,* 82 Or App 1, 5-6, 727 P2d 130 (1986) (emphasis added). I conclude where I started, that there is not a small gap but an insurmountable gap in lack of evidence in the chain of causation and that the gap cannot be closed by resorting to a word of art as an excuse to use the jury as a dumping ground for a cognitively solvable issue that can and should be decided by the court. The causal facts that have been presented in this summary judgment proceeding are so deficient that we can say as a matter of law that defendant's responsibility ends here.

The decision of the Court of Appeals on the vicarious liability issue should be reversed. The judgment of the trial court should be affirmed.

Campbell, J., joins in this dissent.