Argued and submitted September 22, reversed on appeal; affirmed on cross-appeal
December 17, 1997

Terri Ann THOMAS,
*Respondent - Cross-Appellant,*

*v.*

Thomas DYER,
*Defendant,*

*and*

LEGACY MT. HOOD MEDICAL CENTER,
an Oregon corporation, dba Mt. Hood Medical Center;
and Legacy Adventist Venture, an Oregon corporation,
dba Caremark Behavioral Health,
*Appellants - Cross-Respondents.*

(9502-00722; CA A92337)

950 P2d 390

Lindsey H. Hughes argued the cause for appellants - cross-respondents. With her on the briefs were Alan Gladstone, Kathleen T. Carroll and Hallmark, Keating & Abbott, P.C.

Jess M. Glaeser argued the cause and filed the brief for respondent - cross-appellant.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

EDMONDS, J.

**EDMONDS, J.**

This is an action for negligence against defendant Thomas Dyer and defendants Legacy Mt. Hood Medical Center and Legacy Adventist Venture (Mt. Hood).[1] A jury returned a verdict in favor of plaintiff but refused to award punitive damages. Mt. Hood makes multiple assignments of error on appeal, and plaintiff cross-appeals. We reverse on the appeal and affirm on the cross-appeal.

In January 1993, plaintiff went to Mt. Hood Medical Center, a nonprofit alcohol and drug treatment facility, and enrolled in its Chemical Dependency Treatment Program in Gresham. She received inpatient care from January 13 through January 24 and intensive outpatient treatment 12 hours a day, seven days a week from January 25 through January 30. Plaintiff then attended treatment at Mt. Hood's facility in Tualatin, which was closer to where she lived. From February 2 through February 16, 1993, plaintiff participated in intensive outpatient treatment four days a week for several hours each day. Plaintiff then attended continuing outpatient care treatment in Tualatin once a week until May 12, 1993. Plaintiff then stopped treatment and, because of her failure to continue treatment, Mt. Hood discharged her from its program in June 1993.

During the same time period, Dyer was a counselor employed by Mt. Hood. His job responsibilities were to provide comprehensive inpatient and outpatient alcoholism and chemical dependency treatment, including individual counseling and group therapy. He also taught a post-withdrawal syndrome class in the evenings at Mt. Hood. According to his job description, one of the essential functions of his jobs was to "maintain ethical, professional and personal boundaries with the staff, clients, and internal and external customers." During plaintiff's treatment at the Gresham facility, Dyer talked to plaintiff about treatment and counseled her about a number of matters, but he was not her primary therapist.

---

[1] The trial court entered a judgment of dismissal on plaintiff's claim against Dyer based on plaintiff's failure to serve Dyer with a summons and complaint. The remaining defendants are referred to as Mt. Hood.

On plaintiff's last day of her 12-hour-a-day intensive outpatient treatment, Dyer approached plaintiff and asked her to meet him at a nonalcoholic bar that evening. Plaintiff and her roommate went to the bar. However, Dyer did not show up at the bar and later telephoned plaintiff to explain that he had been delayed. He then informed her about a Cocaine Anonymous (CA) group that he had attended. He told her that he thought that she would enjoy meeting the people who attended the group. Plaintiff arranged to meet Dyer at the next CA meeting. After that meeting, they decided to go out to dinner. They then met for lunch the following week, and Dyer presented a rose to plaintiff, telling her that she was his "dream girl." They talked about her treatment and "what [she] needed to do." Dyer suggested that he could help her in her recovery process. They agreed to attend a CA convention the following weekend and went out to dinner afterwards.

After the CA convention, Dyer started visiting plaintiff at her apartment, and, ultimately, she and Dyer began a sexual relationship. Mt. Hood's after-care program included attending AA meetings. Dyer told plaintiff that she was not to tell anybody about their relationship because he would lose his job and that she should not attend AA meetings at Mt. Hood's Gresham facility. Plaintiff testified that, after she completed the inpatient program, she did not see Dyer at the Gresham facility again because Dyer asked her not to return to that facility; however, he also explained that he would continue to provide emotional support for her. The relationship lasted from approximately the beginning of February to the end of March 1993, when plaintiff terminated it.

During that time, plaintiff and Dyer did not tell anyone employed by Mt. Hood about their relationship. Dyer met with his supervisor on February 22, 1993, and told her that he had seen a former patient at a CA convention and that they had socialized at that setting. Dyer's supervisor told him to terminate contact with plaintiff and to abide by the proper professional and ethical standards. Dyer failed to inform his supervisor that he had initiated the contact with plaintiff, that he had seen plaintiff on other occasions for lunch and

dinner and that he and plaintiff had already begun a sexual relationship.[2]

In February 1995, plaintiff filed this action, alleging, in part:

"9.

"During the course of defendants' professional care, treatment and counseling of plaintiff, the defendants were negligent in one or more of the following particulars:

"a) In engaging in sexual conduct with plaintiff;

"b) In failing to obtain a consultation when he knew, or in the exercise of reasonable care should have known, that his care was not benefitting the plaintiff and it was in fact causing injury;

"c) In creating a severe dependency of the plaintiff upon defendant to the degree that plaintiff depended upon defendant to meet her emotional needs;

"d) In allowing his personal emotional involvement with the plaintiff to take the place of his professional judgment in the care of plaintiff to the degree that the emotional involvement completely superseded any professional judgment and rendered it useless;

"e) In entering into multiple relationships with the plaintiff when he knew, or in the exercise of reasonable care should have known, that to do so would injure his patient. Said multiple relationships included but were not limited to being the patient's therapist, friend, lover, counselor, and the only social contact outside of her family; and

"f) In failing to terminate both the personal and the professional relationship with the plaintiff when defendant knew the relationship was causing serious injury to plaintiff.

"* * * * *

"12.

"Defendant Dyer knew that his sexual relationship with plaintiff was a violation of ethical standards, and that the

---

[2] Plaintiff testified that the sexual relationship began on approximately February 20, 1993.

relationship was causing harm to plaintiff. Defendant Dyer told plaintiff that the relationship was wrong, and that if it was discovered by his employer, he would lose his job. Defendant Dyer maintained the relationship in secrecy, taking plaintiff only to places where they would not be observed by anyone familiar with their therapist-patient relationship, and continued to remind plaintiff that if she revealed the existence of the relationship to anyone, defendant Dyer would lose his job. Defendants' conduct, as alleged herein, was willful, wanton, and malicious, and constituted a particularly aggravated disregard of the rights of plaintiff and society, and plaintiff is therefore to recover punitive damages in the sum of $500,000."

Plaintiff also alleged that Dyer was acting in the course and scope of his employment at all times alleged in the complaint. Mt. Hood denied liability. Ultimately, plaintiff's allegations were submitted to the jury, resulting in a verdict in her favor.

■ Mt. Hood first assigns as error the denial of its motion for a directed verdict on plaintiff's claim based on vicarious liability for the conduct of its employee Dyer.[3] ORCP 60. It argues that, as a matter of law, Dyer's conduct was outside the scope of his employment because there is no evidence that he was motivated by a purpose to serve Mt. Hood.

"A directed verdict is appropriate where there is a complete absence of proof on an essential issue, or when there is no conflict in the evidence and it is susceptible of only one construction. * * * In reviewing the denial of a motion for directed verdict, we consider the whole record, including defendant's evidence. * * * We view the evidence in the light most favorable to plaintiff, the nonmoving party." *Monson v. State of Oregon* 136 Or App 225, 231, 901 P2d 904, *rev den* 322 Or 361 (1995). (Citations omitted.)

■ In order to prevail on her claim of vicarious liability, plaintiff was required to plead and prove that Dyer acted within the course and scope of his employment at the times alleged in the claim. *See G.L. v. Kaiser Foundation Hospitals, Inc.*, 306 Or 54, 60, 757 P2d 1347 (1988). To determine

---

[3] Plaintiff alleged claims of direct liability and vicarious liability against Mt. Hood. The jury returned a verdict in favor of Mt. Hood on the claim of direct liability.

whether an employee acts within the course and scope of the employment, we apply a three-part test:

> "(1) whether the act occurred substantially within the time and space limits authorized by the employment; (2) whether the employee was motivated, at least partially, by a purpose to serve the employer; and (3) whether the act is of a kind which the employee was hired to perform." *Chesterman v. Barmon*, 305 Or 439, 442, 753 P2d 404 (1988).

Plaintiff argues that, because the relationship occurred while she was still an outpatient, Dyer's conduct occurred substantially within the time and space limits authorized by the employment. Moreover, she contends that the evidence of the social contact that occurred with Dyer before the sexual relationship began is evidence that Dyer was motivated to serve Mt. Hood and that Dyer's conduct was of a kind that Mt. Hood had hired him to perform. Mt. Hood counters that the jury could not reasonably draw an inference that Dyer was acting to benefit Mt. Hood because both Dyer and plaintiff knew that the relationship would be disapproved of by Mt. Hood. It concludes that,

> "the conscious effort to keep the relationship secret and the acknowledgment [that] Dyer would lose his job for such behavior definitively establishes both parties knew Dyer acted out of personal motives, and not to carry out any employment responsibilities. There is absolutely no evidence to the contrary."

In *G.L.*, the Supreme Court quoted, with approval, section 245 of the *Restatement (Second) of Agency*, which provides:

> "A master is subject to liability for the intended tortious harm by a servant to the person or things of another by an act done in connection with the servant's employment, although the act was unauthorized, if the act was not unexpected in view of the duties of the servant." 306 Or at 60.

We further explained in *Mains v. II Morrow, Inc.*, 128 Or App 625, 631-33, 877 P2d 88 (1994), that an employer could be held vicariously liable for a supervisor's sexual harassment of subordinates in the workplace. We held in that case that "a factfinder could infer from the record that sexual harassment

was a characteristic of [the supervisor's] method of supervising and controlling female subordinate employees in the workplace." *Id.* at 633. We then concluded that such evidence was sufficient to create a factual question regarding whether the supervisor was motivated, at least in part, to serve the employer and whether the act was of a kind that the employee was hired to perform.

Similarly, the issue in this case is whether there is evidence that Dyer was motivated, at least partially, by a purpose to serve the employer. Dyer did not testify at the trial. Plaintiff testified that Dyer helped her through treatment:

"Well, he was—my family at this time still wasn't real comfortable around me, and all the friends I'd had before were basically at the bar and bartenders or cocktail waitresses, and that he had been there before, been sober for four years, and that he would help me out."

Plaintiff also said that they discussed her treatment:

"There was a certain step that you had to do, and he—I was having difficulty with them, so he would help me with them. He [Dyer]— he just told me a lot about what he went through and what to expect that I was going to go through and pretty much hit a lot of the emotions that I was feeling he told me that I was going to feel."

At another point in her testimony, she said that, at lunch, they discussed her

"treatment and what I needed to do and, uhm, just a lot of again, how it's hard to have lunch out and not drink. How it is to get back into, oh, relationships with people."

On cross-examination, plaintiff testified:

"Q. Did you think [Dyer] was seeing you outside of the Mt. Hood facility as part of his job at Mt. Hood?

"A. Not directly, but he was a counselor.

"Q. Do you remember me asking you questions, and I asked you, after you saw Mr. Dyer as I understand it at Mt. Hood when you were at the CA convention was that the last time you saw him at the Mt. Hood facility, and you answered yes?

"A. Yes.

"Q. And at any point after you saw him after that did you understand the contact to be a part of the treatment you were receiving at Mt. Hood?

"And you answered that I don't think that they hired him to sleep with me. Is that what you're referring to?

"I asked you at any time, and the answer you gave me was did I think Mt. Hood had hired him to come out and teach me how to live and sleep with me? No.

"Is that correct?

"A. Yes.

"* * * * *

"Q. Do you recall being asked whether the lunches that you had with Mr. Dyer were part of your treatment program?

"A. I don't recall it, but it sounds like something you asked.

"* * * * *

"Q. At that point do think the lunches that you had were part of your treatment at Mt. Hood?

"A. No.

"Q. Do you think that he was doing it as a part of his job at Mt. Hood?

"A. No."

We agree with Mt. Hood that there is no evidence that Dyer intended to benefit Mt. Hood through any of his actions after he asked plaintiff out to dinner after the CA meeting. From that point on, the evidence is uncontroverted that Dyer was undertaking a social relationship for his own benefit. Although plaintiff points out that Dyer counseled her during their relationship, there is no reasonable inference that can be drawn from that fact that he intended to benefit his employer through that conduct, only that he intended to benefit plaintiff and, perhaps, himself. After plaintiff began her relationship with Dyer, she did not return to the facility where Dyer worked. None of Dyer's inappropriate conduct occurred in the workplace. Moreover, Mt. Hood's treatment

plan for plaintiff did not contemplate social contacts with Dyer, nor is there any evidence that it included counseling of plaintiff by Dyer as a "private counselor." In fact, Dyer failed to inform his employer of the relationship with plaintiff. It is a mere fortuity that Dyer may have rendered counseling to plaintiff during the course of their social relationship. Thus, plaintiff has failed to present any evidence that Dyer, during the period in question, was motivated to serve Mt. Hood.

Nevertheless, plaintiff argues that the *Chesterman* test is not the only way of demonstrating vicarious liability. She contends that when an act is not unexpectable in view of the duties of the servant, a master is subject to liability for the torts of the servant, relying on § 245 of the *Restatement (Second) of Agency*. She also quotes from the *Restatement (Second) of Agency* § 229 comment a (1958):

"[T]he ultimate question is whether or not it is just that the loss resulting from the servant's acts should be considered as one of the normal risks to be born by the business in which the servant is employed."

At trial, plaintiff produced evidence that treatment providers for patients with addictions must exercise care to ensure that their counselors do not become personally involved with patients. She asserted that, because Dyer's misconduct was an inherent risk in the therapist-patient relationship that Mt. Hood had authorized, Mt. Hood must bear the burden of that risk as a result of the nature of its business. Therefore, according to plaintiff, Mt. Hood is vicariously liable for injuries caused by Dyer's relationship with plaintiff, even if Dyer acted outside the scope of his authority.

Plaintiff overlooks the fact that the jury rejected her claim that Mt. Hood was directly negligent because of its alleged failure to perform its obligations as a treatment provider. Moreover, although the *Restatement* sections are helpful to our analysis, they are not controlling. In Oregon, plaintiff must allege and prove the *Chesterman* requirements. *G.L.*, 306 Or at 60; *see also Lourim v. Swensen*, 147 Or App 425, 437-38, 936 P2d 1011, *rev allowed* 326 Or 133 (1997) (holding that *Chesterman* is the only test to determine

whether an employer is liable under the doctrine of *respondeat superior*). In this case, plaintiff failed to present any evidence that Dyer's conduct was for his employer's benefit. If we were to adopt plaintiff's argument, she would be relieved from proving the *Chesterman* requirements while seeking to impose vicarious liability for Dyer's conduct that was outside the course and scope of his employment. That result is contrary to the policy underlying *respondeat superior*. It is only appropriate to impute liability for an employee's acts to an employer when the employer's objectives are being furthered. We conclude that the trial court erred when it denied Mt. Hood's motion for a directed verdict on plaintiff's claim based on vicarious liability. Consequently, we do not reach defendant's other assignment of error.

Plaintiff's cross-appeal assigns error to the failure to give and the giving of certain instructions on punitive damages as alleged in paragraph 12. Because the trial court should have granted defendant's motion for a directed verdict on the claim based on vicarious liability, there could be no error concerning the instructions on the claim for punitive damages that was part of the vicarious liability claim.

Reversed on appeal; affirmed on cross-appeal.