Argued and submitted March 1, 2013, affirmed April 8, petition for review allowed September 10, 2015 (357 Or 743)
See later issue Oregon Reports

John HARKNESS
and Sherri Harkness,
*Plaintiffs-Appellants,*

*v.*

Jack R. PLATTEN,
*Defendant-Respondent.*

Washington County Circuit Court
C092970CV; A147439

348 P3d 1145

Emil R. Berg argued the cause for appellants. With him on the briefs were Leonard D. DuBoff, and The DuBoff Law Group, LLC.

James C. Tait argued the cause for respondent. With him on the brief was Tait & Associates, P. C.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

ARMSTRONG, P. J.

**ARMSTRONG, P. J.**

In this legal malpractice and negligent misrepresentation action, plaintiffs appeal a judgment directing a verdict in favor of defendant. In the underlying case, defendant was one of the attorneys representing plaintiffs against Joanne Kantor and her successive employers Sunset Mortgage Company (Sunset) and Directors Mortgage, Inc. (Directors). The underlying action arose out of the misconduct of Kantor in inducing plaintiffs to borrow money from Sunset and Directors and then give that money to Kantor to invest in private, hard-money loans that were supposed to have been secured. Shortly before trial in the underlying action, plaintiffs agreed to settle the entire matter for $600,000, an amount significantly less than their damages.

In bringing this action against defendant, plaintiffs asserted that, but for defendant's legal malpractice and negligent misrepresentation during the settlement negotiations, they would have proceeded to trial and obtained a more favorable result against Sunset and Directors than the settlement amount. After plaintiffs put on their case in chief, the trial court granted defendant a directed verdict based on its conclusion that plaintiffs had not presented evidence that Kantor had apparent authority from either Sunset or Directors to engage in the hard-money loan investment scheme with plaintiffs and that, without that showing, plaintiffs would not have prevailed at trial against Sunset or Directors in the underlying action. We conclude that the trial court did not err and affirm.

In reviewing the grant of defendant's motion for a directed verdict, "we view the evidence and all reasonable inferences in the light most favorable to the plaintiff." *Patton v. Mutual of Enumclaw Ins. Co.*, 238 Or App 101, 124, 242 P3d 624 (2010), *rev den*, 349 Or 654 (2011). "A directed verdict for the defendant on a negligence claim is proper only if there is no evidence from which the jury could have found the facts necessary to establish the elements of the claim." *Id.* Based on that view of the evidence, the relevant facts are as follows.

Plaintiffs—John and Sherri Harkness—were interested in using the equity in their home to invest when John

saw a homemade flyer for various businesses at work. The flyer included a photocopy of Kantor's business card that indicated Kantor was a loan officer with Sunset. After John spoke with a coworker who had worked with Kantor to purchase an apartment complex, plaintiffs set up and attended a meeting with Kantor at her Sunset office. Kantor proposed that plaintiffs borrow money from Sunset, using the equity in their house as collateral, and then she would invest those proceeds in short-term, high-interest loans to developers and building contractors (hard-money loans). She told plaintiffs that those hard-money loans would be secured by first or second liens on real property with "lots" of equity. Kantor explained that she and Sunset would get paid from the commission on plaintiffs' conventional loan on their house and from the conventional construction loans that Sunset would do for the builders.

After meeting with Kantor at Sunset again, plaintiffs agreed to the proposal, took out a conventional loan from Sunset, and turned over the loan proceeds to Kantor. Kantor did use those proceeds to make hard-money loans to several people and prepared certain documentation on Sunset letterhead. For the first of those loans, which was not funded from the Sunset loan proceeds turned over to Kantor, Sherri gave Kantor a cashier's check made out to Sunset. Sherri always met with Kantor at her Sunset office to learn about additional hard-money loan opportunities and to receive copies of notes for the loans Kantor made, which were always closed outside of plaintiffs' presence.

Kantor later went to work as a loan officer at Directors. Plaintiffs continued their same investment relationship with Kantor at Directors and met with her at her Directors' office in the same manner as when Kantor was at Sunset. Plaintiffs also took out an additional loan from Directors, using their rental house as collateral, the proceeds of which were paid directly to Kantor to make hard-money loans to people Kantor found. Kantor's assistant at Directors was knowledgeable about all of plaintiffs' hard-money loans and would assist plaintiffs with information on those matters.

Plaintiffs did not get loan payments directly from borrowers and did not know how borrowers made payments,

but Kantor arranged deposits into plaintiffs' bank account to service plaintiffs' personal loans. Sherri testified that certain notes directed payments to be made at addresses that corresponded to Sunset's or Directors' office address. Plaintiffs did not receive the proceeds from some of the note payoffs; instead, when a note was paid off or came due but not paid off, Kantor would recommend that plaintiffs immediately invest payoffs into new loans or roll over unpaid loans into a new loan to the same borrower, which plaintiffs would then do.

Sherri testified that she would not have dealt with Kantor if she were not working through Sunset. She also testified that she would not have continued working with Kantor if Kantor had not been at Directors. Sherri believed that Kantor was a representative of Sunset, and then Directors, and was acting within the scope of her employment in all her dealings with plaintiffs. However, it was undisputed that Kantor, in fact, was not performing duties for which she was hired as a loan officer with regard to the investment scheme and hard-money loan arrangements—that type of transaction was not part of the business of either Sunset or Directors—and neither Sunset nor Directors received any fees or commissions from the hard-money loans. There also was no evidence that the control persons at Sunset or Directors were aware of Kantor's arrangement with plaintiffs.

After about two years of investing with Kantor, plaintiffs were contacted by an attorney for one of the borrowers on a hard-money loan financed by plaintiffs. Kantor told Sherri that she just had forgotten to record a lien, so Sherri accompanied Kantor to record the lien. The borrower then sued plaintiffs. At the end of that lawsuit, plaintiffs learned that Kantor had forged the documents for at least that loan, and, for other loans, Kantor had not recorded any liens, or had recorded a lien in third position behind a lien Kantor had placed in favor of Directors on the property. Kantor also had been running all the money through her personal accounts. At the conclusion of that lawsuit, plaintiffs held notes to five outstanding loans, including the one deemed a forgery by the court, that totaled approximately

$980,000, and at least one of the borrowers had already filed bankruptcy.

Plaintiffs then retained attorney Flaherty to represent them in a suit against Kantor, Sunset, and Directors (the underlying action).[1] Sometime after filing the underlying action, Flaherty contacted defendant to be a securities law expert in the case, but, instead, defendant fully associated with Flaherty as co-counsel in the case to assist with securities law issues. Defendant advised Flaherty to have plaintiffs amend their complaint to include the control persons for Sunset and Directors as defendants in the action, which they did.[2] Plaintiffs were not informed at that time about any risks associated with doing so or as to any defenses that the control persons might have.

Defendant often acted as co-counsel in the underlying action after being brought in, including preparing a response to a significant summary judgment motion that plaintiffs allege was inadequate. From that motion, Sunset obtained summary judgment on plaintiffs' contract claims against Sunset, and the trial court indicated it would entertain a similar motion from Directors.

About six days before trial, the parties in the underlying action engaged in a two-day mediation. At a summary judgment hearing one day before mediation, plaintiffs learned, for the first time, that Sunset and Directors contended that the statute of limitation barred certain claims, but Flaherty and defendant downplayed the contention, which Sherri took to mean that it was not true. During mediation, however, Flaherty and defendant confirmed to plaintiffs that there was a real risk of them being ordered to pay attorney fees to the control persons because the statute of limitation had run on those claims.

---

[1] Plaintiffs also brought a negligence claim against Fidelity National Title Company of Oregon in the underlying action. That claim was not part of plaintiffs' malpractice case against defendant.

[2] In the second amended complaint in the underlying action, plaintiffs alleged claims for negligence, breach of contract, conversion, fraud, violation of state mortgage brokerage laws, breach of fiduciary duty, unjust enrichment, for an accounting, and rescission against Kantor, Sunset, and Directors; slander of title against Kantor and Directors; and violation of state security laws and the Oregon Racketeer Influenced and Corrupt Organization Act (ORICO) against Kantor, Sunset, Directors, and the control persons for Sunset and Directors.

Also before the mediation, Flaherty and defendant had told plaintiffs only that they had a good case without exposure of counterclaims against them, and that they were prepared to take the case to trial. However, during the second day of the mediation, Flaherty and defendant indicated to John that they were not fully prepared for the trial that was to begin in five days, and they told plaintiffs that, if they settled, plaintiffs could go after the borrowers of the hard-money loans for additional funds. Defendant specifically told them that "[t]here's ways of getting money from the borrowers." At the time of that statement, Sherri knew that at least one borrower on a big loan was not in bankruptcy.

At the end of the two-day mediation, the parties settled the underlying action for $600,000. Plaintiffs testified that that amount could not make them whole because it would leave them with significant amounts owing on their residential mortgage. Plaintiffs' expert in the malpractice case testified that, on the date of the settlement, the total amount owing to plaintiffs on the five outstanding loans was $998,149. Plaintiffs believed at the time of the settlement that their total damages were approximately $1.15 million. Plaintiffs initially were prepared to reject a $600,000 settlement and go to trial because they were led to believe by their attorneys that they had a strong case. After learning about their exposure to attorney fees and that Flaherty and defendant were not prepared for trial, and relying on defendant's assurance that they could get money from borrowers, plaintiffs decided to settle for $600,000.

After the settlement, plaintiffs contacted defendant to pursue the big borrower. Defendant declined to take the case and told plaintiffs that "you'd be better off to take your money and take it to Vegas and put it in a slot machine." Plaintiffs would not have accepted the settlement if defendant had not told them that there were ways to collect from the borrowers. Plaintiffs hired another attorney to sue that borrower, but the borrower filed bankruptcy.

Plaintiffs then brought a legal malpractice case against Flaherty, which was dismissed for reasons not

disclosed in the record. Following that dismissal, plaintiffs brought this legal malpractice and negligent misrepresentation case against defendant. At the close of plaintiffs' case, defendant moved for a directed verdict on several grounds. After rejecting certain of those grounds, the trial court granted a directed verdict to defendant based on defendant's argument that plaintiffs could not have prevailed in the underlying action against Sunset and Directors. Before turning to the detail of the trial court's ruling and the parties' arguments on appeal, we pause briefly to discuss the nature of plaintiffs' action against defendant to give context to that discussion.

Plaintiffs brought two claims against defendant— legal malpractice and negligent misrepresentation. Legal malpractice is "a variety of negligence in which a special relationship gives rise to a particular duty that goes beyond the ordinary duty to avoid a foreseeable risk of harm." *Watson v. Meltzer*, 247 Or App 558, 565, 270 P3d 289 (2011), *rev den*, 352 Or 266 (2012). Similarly, negligent misrepresentation is a variety of negligence that "must be predicated on some duty of the negligent actor to the injured party beyond the common law duty to exercise reasonable care to prevent foreseeable harm," such as that created by the attorney-client relationship. *Onita Pacific Corp. v. Trustees of Bronson*, 315 Or 149, 159-60, 843 P2d 890 (1992). To prevail on either negligence claim, plaintiffs had to demonstrate, among other things, a causal link between defendant's breach of his duty to plaintiffs and the resulting alleged harm suffered by plaintiffs, measurable in damages. *Watson*, 247 Or App at 568 ("[T]he underlying requirement in all negligence cases—not just legal malpractice cases—remains that a plaintiff must prove that, but for the defendant's negligence, the plaintiff would not have suffered the harm that has been alleged."). In the context of this case, in which the alleged attorney negligence occurred during litigation, to prove the causation element for either of their claims, plaintiffs had to prove a "case within a case." That is, plaintiffs were required to show that, but for defendant's legal malpractice or negligent misrepresentation, plaintiffs would have gone to trial in the underlying action, prevailed against Sunset or

Directors, and been awarded more than the $600,000 that they received in the settlement.[3] *Id.* at 566-67.

For their case within a case on their contract claims, plaintiffs proceeded on a theory that Kantor had apparent authority from Sunset and Directors to bind those companies to the oral contract that made up Kantor's investment scheme with plaintiffs.[4] Plaintiffs clarified to the trial court that the contract they were talking about was the entire investment scheme with Kantor:

> "The contract was, you take out a conventional mortgage through us and we will act as your, call it investment advisor, whatever, and place the proceeds of that into these private-money loans, and you're going to make a lot of money from that because we're going to invest them only under certain conditions to ensure that these loans are safe."

Plaintiffs argued that, had defendant defended the summary judgment motion properly, they would have proceeded to trial and won on those claims.

For plaintiffs' other claims in the underlying action—negligence, breach of contract, conversion, fraud, violation of state mortgage brokerage laws, breach of fiduciary duty, for an accounting, rescission, slander of title, and violation of state security laws[5]—plaintiffs argued that Sunset and Directors were vicariously liable for Kantor's actions as her employers under a *respondeat superior* theory that Kantor appeared to be acting within her scope of employment. Plaintiffs again clarified with the trial court with respect to all of those claims that plaintiffs were proceeding based on the entire investment scheme orally proposed by Kantor—*viz.*, plaintiffs did not base any claims on a stand-alone hard-money loan or the original conventional loans plaintiffs took

---

[3] Plaintiffs did not dispute below, nor do they dispute on appeal, the trial court's conclusion that plaintiffs' case depended on demonstrating that they had viable claims against Sunset or Directors because those companies would have been the only source of funds for a jury award.

[4] Plaintiffs conceded that there was no evidence that Kantor had any actual authority as part of her employment to engage in the investment scheme with plaintiffs.

[5] Plaintiffs conceded that they did not have a viable ORICO claim or unjust-enrichment claim, which were pleaded in the underlying action.

out; they repeatedly clarified that their claims were based on Kantor's investment proposal and role as an "investment advisor" to plaintiffs. Plaintiffs argued that, had defendant properly advised them about the claims against the control persons, been prepared for trial, and not made a misrepresentation to them during settlement, they would have proceeded to trial and won on those claims.

Thus, as presented to the trial court below (and again on appeal to us) both plaintiffs' apparent authority and *respondeat superior* theories were based on the same argument and evidence—Sunset and Directors clothed Kantor with the apparent authority to engage in the investment scheme with plaintiffs on behalf of the companies as part of her employment as a loan officer with the companies. In granting the directed verdict for defendant, the trial court concluded that the case came down to a question of the existence of apparent authority because the issue for either plaintiffs' apparent authority or *respondeat superior* theory was whether Kantor was acting within the scope of apparent authority with which Sunset or Directors had clothed her. The trial court concluded that plaintiffs did not present any evidence that would have allowed them to recover at trial against Sunset or Directors on any of their claims because "there was no evidence of any actual or apparent authority in this particular case." Based on its conclusion, the trial court entered a judgment for defendant, which plaintiffs now appeal.

Apparent authority is an agency theory that applies "when an agent acts in excess of his or her actual authority but with the appearance of authority." *Badger v. Paulson Investment Co., Inc.*, 311 Or 14, 24, 803 P2d 1178 (1991). "Apparent authority is created 'only by some conduct of the principal which, when reasonably interpreted, causes a third party to believe that the principal consents to have the apparent agent act for him on that matter. The third party must also rely on that belief.'" *Id.* (quoting *Mattson v. Commercial Credit Business Loans*, 301 Or 407, 422, 723 P2d 996 (1986)). The touchstone for apparent authority is that the principal must be responsible for the information that leads a third party to reasonably believe that the

principal consents to the agent's acts. That is, "the principal must take some affirmative step in creating the appearance of authority, one that the principal either intended to cause or 'should realize' likely would cause a third party to believe that the putative agent has authority to act on the principal's behalf." *Eads v. Borman*, 351 Or 729, 737, 277 P3d 503 (2012) (citing *Badger*, 311 Or at 24 n 9). With regard to a third party's reliance on information from the principal, it must be objectively reasonable. "In assessing the reasonableness of the reliance, the analysis is influenced by what is customary and usual for certain positions or within certain professions." *Id.*

In the context of this case, for Sunset or Directors to be bound by Kantor's conduct in engaging in the investment scheme with plaintiffs, plaintiffs had to show that (1) Sunset, and then Directors, provided information to plaintiffs that was intended to cause, or Sunset and Directors should have realized would cause, plaintiffs to believe that Kantor was authorized to act on behalf of Sunset, and then Directors, in proposing, and then acting as a financial advisor in carrying out, the investment scheme with plaintiffs; and (2) from the information provided by Sunset, and then Directors, plaintiffs reasonably believed that Kantor was so authorized. *Badger*, 311 Or at 25; *see also Eads*, 351 Or at 737.

On appeal, relying on *Badger*, plaintiffs assert that they did present sufficient evidence for their claims to be decided by the jury based on an apparent-authority theory.[6]

---

[6] Plaintiffs also argue that the trial court failed to determine the vicarious liability of Sunset and Directors for plaintiffs' noncontract-based claims under their *respondeat superior* theory, citing *Schmidt v. Archdiocese of Portland in Oregon*, 235 Or App 516, 234 P3d 990, *rev den*, 349 Or 171 (2010). As that case explains,

"under the doctrine of *respondeat superior*, an employer is vicariously liable for an employee's tortious conduct, including intentional torts, when the employee acts within the scope of employment. *** The Supreme Court's opinion in *Chesterman v. Barmon*, 305 Or 439, 753 P2d 404 (1988), outlines three requirements that must be met in order to establish that the employee's conduct was within the scope of employment: (1) the conduct must have occurred substantially within the time and space limits authorized by the employment; (2) the employee must have been motivated, at least partially, by a purpose to serve the employer; and (3) the act must have been of a kind that the employee was hired to perform. *Id.* at 442. Although, in *Chesterman*,

Plaintiffs assert that the following evidence was sufficient for the apparent authority issue to go to the jury with regard to Sunset: plaintiffs learned of Kantor through a flyer that included Kantor's Sunset business card; plaintiffs met with Kantor at her Sunset office and believed she represented Sunset; on Kantor's advice, they borrowed money from Sunset and turned it over for investment to Kantor; Sunset received a commission from their conventional loan; Kantor prepared documents regarding the hard-money loans on Sunset letterhead; certain notes directed the borrower to send payments to an address that corresponded to Sunset's office address; Sherri funded the first hard-money loan with a cashier's check made out to Sunset; and Sunset was a mortgage finance provider and a mortgage broker and plaintiffs did not know that Sunset did not engage in hard-money loans as part of its regular business and believed that Kantor was acting as an employee of Sunset.

Plaintiffs further assert that the following evidence was sufficient for the apparent authority issue to go to the jury with regard to Directors: plaintiffs continued to deal with Kantor in the same manner at Directors; Kantor used Directors' letterhead; plaintiffs borrowed additional money from Directors that they turned over for investment to Kantor; Directors received a commission from their conventional loan; certain notes directed the borrower to send payments to an address that corresponded to Directors' office address; Sherri met with and telephoned Kantor at Directors; Sherri dealt with Kantor's assistant at Directors; Sherri believed that she was dealing with Directors; and

the court held that the intentional tort itself unquestionably was outside the scope of employment, *id.* at 443, the court said that '[t]he focus should be on the *act* on which vicarious liability is based and not on when the act results in *injury.' Id.* at 444 (emphasis in original)."

*Schmidt,* 235 Or App at 520-21. Plaintiffs state that the evidence of the first and third elements of *respondeat superior* "is the same as the evidence for Kantor's apparent authority discussed above with respect to the breach of contract claim." However, plaintiffs do not raise or develop any legal arguments as to how that evidence meets the *respondeat superior* elements. Accordingly, we will address only plaintiffs' contentions based on their apparent-authority theory. *See, e.g., Beall Transport Equipment Co. v. Southern Pacific,* 186 Or App 696, 700 n 2, 64 P3d 1193, *adh'd to on recons,* 187 Or App 472, 68 P3d 259 (2003) ("[I]t is not this court's function to speculate as to what a party's argument might be. Nor is it our proper function to make or develop a party's argument when that party has not endeavored to do so itself.").

Directors was in the mortgage broker business and plaintiffs did not know that Directors did not engage in hard-money loans as part of its regular business and believed Kantor was acting as an employee of Directors.[7]

We conclude that plaintiffs did not put on sufficient evidence of apparent authority to survive defendant's directed-verdict motion. Plaintiffs presented no evidence that Kantor had the apparent authority to give investment advice on behalf of either company, engage in the proposed investment scheme, or, for the contract claim, bind Sunset or Directors to the oral terms of that scheme. We start our discussion with the evidence that must be disregarded under the law of apparent authority because there was no evidence presented that that information came from Sunset or Directors: (1) the homemade flyer at John's workplace; (2) the notes directing borrowers to deliver payments to Kantor's office (*viz.*, the address of Sunset's and then Directors' office); and (3) Sherri delivering a cashier's check to Kantor that was made out to Sunset. We also must disregard the evidence related to Kantor arranging for plaintiffs to take out a conventional loan from Sunset and Directors and the companies receiving a commission on those loans because those acts were within Kantor's actual authority as a loan officer for Sunset and Directors and are not evidence that Kantor had apparent authority to do more than just that.

Having focused our inquiry, we are left with the following evidence on which plaintiffs rely: Kantor had a business card that indicated she was a loan officer at Sunset; Kantor was a loan officer at Sunset and then Directors; plaintiffs met with Kantor at her office located in Sunset's offices and then Directors' offices; Kantor prepared documentation on Sunset's and then Directors' letterhead;

---

[7] Plaintiffs also argue that additional evidence supporting their claim was that deeds of trust were marked to be returned to Sunset after recording and that borrowers sent payments to Sunset's or Directors' offices. However, plaintiffs testified that they did not have any copies of the deeds of trusts until after Kantor's misdeeds were uncovered. As a result, that evidence could not have led plaintiffs to believe that Kantor had authority to engage in the transactions. Also, as set out above, plaintiffs did not present evidence of how borrowers actually made payments, only that certain notes directed payments to addresses that corresponded to Sunset's or Directors' office address.

plaintiffs dealt with Kantor's assistant at Directors'; and Sunset and Directors were in the business of brokering conventional loans. In sum then, plaintiffs' argument is that, because Kantor was a loan officer at mortgage brokerages and because those mortgage brokerages provided Kantor with an office and access to letterhead in order to perform her job as a loan officer, Sunset and Directors necessarily clothed Kantor with the apparent authority to act as a financial advisor on behalf of Sunset and Directors and bind the companies to an oral investment contract.

Plaintiffs' argument wholly rests on plaintiffs' belief that Kantor had the authority to broker all sorts of loans as a loan officer for a mortgage broker, not just conventional mortgages. However, those contracts and acts—the creation of the hard-money loans themselves—are not the contracts or acts to which plaintiffs seek to bind Sunset and Directors. Plaintiffs seek to bind Sunset and Directors to an entire investment scheme whereby plaintiffs handed over significant funds from their conventional mortgage refinance to Kantor to invest as opportunities came along based solely on Kantor's oral promises that the investment vehicles (the hard-money loans) would be "secure." It was not objectively reasonable for plaintiffs to believe that that type of investment scheme was part of Kantor's job as a "loan officer," nor did Sunset or Directors provide any information to plaintiffs, whether directly or indirectly, that such a scheme or financial advice was part of Kantor's job. Giving Kantor the title of "loan officer" and an office and access to letterhead is not the type of information that Sunset or Directors should have realized would cause a third party to believe that Kantor had the authority to set up such an investment scheme. Plaintiffs' reliance on *Badger* to make their case is misplaced.

In *Badger*, the plaintiffs sought to hold Paulson Investment Company (Paulson), a company engaged in the sale of securities both as a broker-dealer and an investment advisor, responsible for the acts of two of its registered representatives, Lambo and Kennedy (the agents), who had engaged in fraudulent securities practices and the sale of unregistered securities. 311 Or at 17. The Supreme Court concluded that there was sufficient evidence to support a

finding that the agents were acting with apparent authority from Paulson based on the following: Paulson employed the agents as registered representatives and sent announcements to its customers announcing their association with Paulson and assignment to ongoing customer accounts; following the announcements, the agents sent information to the plaintiffs on Paulson letterhead about both Paulson-approved securities and the unregistered securities; the agents conducted sales presentations touting the unregistered securities on Paulson's premises; and the agents received calls regarding the unregistered securities at Paulson's office. *Id.* at 25-26. Thus in that case, the agents were selling both unregistered and Paulson-approved securities in the same manner to Paulson customers after Paulson informed its customers that the agents were authorized to sell securities on behalf of Paulson. As a result, the plaintiffs reasonably believed that the agents were authorized to act for Paulson concerning the unregistered securities. *Id.* at 26. That circumstance is in sharp contrast to this case, in which neither Sunset nor Directors provided any information to plaintiffs from which they could reasonably conclude that Kantor was authorized by them to act as a financial advisor to, or engage in investment schemes with, its mortgage customers.

Accordingly, we conclude that the trial court did not err in granting a directed verdict for defendant on all of plaintiffs' claims.

Affirmed.