No. 38 June 16, 2016 715

IN THE SUPREME COURT OF THE
STATE OF OREGON

John HARKNESS
and Sherri Harkness,
*Petitioners on Review,*

*v.*

Jack R. PLATTEN,
*Respondent on Review.*

(CC C092970CV; CA A147439; SC S063222)

On review from the Court of Appeals.*

Argued and submitted March 4, 2016.

Emil R. Berg, Boise, Idaho, argued the cause and filed the brief for petitioners on review. With him on the brief was Leonard D. DuBoff, The Duboff Law Group, Portland.

James M. Callahan, Callahan & Shears, P.C., Portland, argued the cause and filed the brief for respondent on review.

Scott A. Shorr, Stoll Stoll Berne Lokting & Shlachter PC, Portland, filed the brief for *amicus curiae* Oregon Trial Lawyers Association.

Before Balmer, Chief Justice, Kistler, Walters, Landau, Baldwin, Brewer, Justices, and DeVore, Justice pro tempore.**

BALDWIN, J.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

_____
* Appeal from Washington County Circuit Court, Charles D. Bailey, Judge. 270 Or App 260, 348 P3d 1145 (2015)

** Nakamoto, J., did not participate in the consideration or decision of this case.

**BALDWIN, J.**

This is a legal malpractice and negligent misrepresentation case where we review a trial court judgment directing a verdict in favor of Platten (defendant). In an earlier lawsuit, defendant had represented the Harknesses (plaintiffs) against Kantor, a loan officer, and her successive employers, Sunset Mortgage (Sunset) and Directors Mortgage, Inc. (Directors), as the result of a fraudulent investment and loan scheme directed at plaintiffs by Kantor. That case did not settle to plaintiffs' satisfaction, and plaintiffs sought to recover their remaining loss from defendant. In this case, the trial court granted defendant's motion for a directed verdict based on the conclusion that plaintiffs' liability theories of apparent authority and *respondeat superior* asserted against Sunset and Directors were not supported by sufficient evidence in the record and could not have led to a result more favorable than the settlement. Plaintiffs appealed the trial court ruling, and the Court of Appeals affirmed. *Harkness v. Platten*, 270 Or App 260, 348 P3d 1145 (2015). For the reasons explained below, we reverse the decisions of the trial court and the Court of Appeals.

The facts as stated by the Court of Appeals, which we adopt, are as follows:[1]

> "Plaintiffs *** were interested in using the equity in their home to invest when [Mr. Harkness] saw a homemade flyer for various businesses at work. The flyer included a photocopy of Kantor's business card that indicated Kantor was a loan officer with Sunset. After [Mr. Harkness] spoke with a coworker who had worked with Kantor to purchase an apartment complex, plaintiffs set up and attended a meeting with Kantor at her Sunset office. Kantor proposed that plaintiffs borrow money from Sunset, using the equity in their house as collateral, and then she would invest those proceeds in short-term, high-interest loans to developers and building contractors (hard-money loans). She told plaintiffs that those hard-money loans would be secured

---

[1] In its review of the grant of defendant's motion for a directed verdict, the Court of Appeals properly viewed the evidence and all reasonable inferences in the light most favorable to plaintiffs. *Trees v. Ordonez*, 354 Or 197, 200, 311 P3d 848 (2013). We omit part of the factual statement relating to plaintiffs' allegations of malpractice, because those facts are not relevant to our review.

by first or second liens on real property with 'lots' of equity. Kantor explained that she and Sunset would get paid from the commission on plaintiffs' conventional loan on their house and from the conventional construction loans that Sunset would do for the builders.

"After meeting with Kantor at Sunset again, plaintiffs agreed to the proposal, took out a conventional loan from Sunset, and turned over the loan proceeds to Kantor. Kantor did use those proceeds to make hard-money loans to several people and prepared certain documentation on Sunset letterhead. For the first of those loans, which was not funded from the Sunset loan proceeds turned over to Kantor, [Mrs. Harkness] gave Kantor a cashier's check made out to Sunset. [Mrs. Harkness] always met with Kantor at her Sunset office to learn about additional hard-money loan opportunities and to receive copies of notes for the loans Kantor made, which were always closed outside of plaintiffs' presence.

"Kantor later went to work as a loan officer at Directors. Plaintiffs continued their same investment relationship with Kantor at Directors and met with her at her Directors' office in the same manner as when Kantor was at Sunset. Plaintiffs also took out an additional loan from Directors, using their rental house as collateral, the proceeds of which were paid directly to Kantor to make hard-money loans to people Kantor found. Kantor's assistant at Directors was knowledgeable about all of plaintiffs' hard-money loans and would assist plaintiffs with information on those matters.

"Plaintiffs did not get loan payments directly from borrowers and did not know how borrowers made payments, but Kantor arranged deposits into plaintiffs' bank account to service plaintiffs' personal loans. [Mrs. Harkness] testified that certain notes directed payments to be made at addresses that corresponded to Sunset's or Directors' office address. Plaintiffs did not receive the proceeds from some of the note payoffs; instead, when a note was paid off or came due but not paid off, Kantor would recommend that plaintiffs immediately invest payoffs into new loans or roll over unpaid loans into a new loan to the same borrower, which plaintiffs would then do.

"[Mrs. Harkness] testified that she would not have dealt with Kantor if she were not working through Sunset. She also testified that she would not have continued

working with Kantor if Kantor had not been at Directors. [Mrs. Harkness] believed that Kantor was a representative of Sunset, and then Directors, and was acting within the scope of her employment in all her dealings with plaintiffs. However, it was undisputed that Kantor, in fact, was not performing duties for which she was hired as a loan officer with regard to the investment scheme and hard-money loan arrangements—that type of transaction was not part of the business of either Sunset or Directors—and neither Sunset nor Directors received any fees or commissions from the hard-money loans. There also was no evidence that the control persons at Sunset or Directors were aware of Kantor's arrangement with plaintiffs.

"After about two years of investing with Kantor, plaintiffs were contacted by an attorney for one of the borrowers on a hard-money loan financed by plaintiffs. Kantor told [Mrs. Harkness] that she just had forgotten to record a lien, so [Mrs. Harkness] accompanied Kantor to record the lien. The borrower then sued plaintiffs. At the end of that lawsuit, plaintiffs learned that Kantor had forged the documents for at least that loan, and, for other loans, Kantor had not recorded any liens, or had recorded a lien in third position behind a lien Kantor had placed in favor of Directors on the property. Kantor also had been running all the money through her personal accounts. At the conclusion of that lawsuit, plaintiffs held notes to five outstanding loans, including the one deemed a forgery by the court, that totaled approximately $980,000, and at least one of the borrowers had already filed bankruptcy.

"Plaintiffs then retained attorney Flaherty to represent them in a suit against Kantor, Sunset, and Directors (the underlying action). Sometime after filing the underlying action, Flaherty contacted defendant to be a securities law expert in the case, but, instead, defendant fully associated with Flaherty as co-counsel in the case to assist with securities law issues. * * *

"* * * * *

"At the end of [a] two-day mediation, the parties settled the underlying action for $600,000. Plaintiffs testified that that amount could not make them whole because it would leave them with significant amounts owing on their residential mortgage. Plaintiffs' expert in the malpractice case testified that, on the date of the settlement, the total

amount owing to plaintiffs on the five outstanding loans was $998,149. Plaintiffs believed at the time of the settlement that their total damages were approximately $1.15 million. Plaintiffs initially were prepared to reject a $600,000 settlement and go to trial because they were led to believe by their attorneys that they had a strong case. After learning about their exposure to attorney fees and that Flaherty and defendant were not prepared for trial, and relying on defendant's assurance that they could get money from borrowers, plaintiffs decided to settle for $600,000.

"After the settlement, plaintiffs contacted defendant to pursue the big borrower. Defendant declined to take the case and told plaintiffs that 'you'd be better off to take your money and take it to Vegas and put it in a slot machine.' Plaintiffs would not have accepted the settlement if defendant had not told them that there were ways to collect from the borrowers. Plaintiffs hired another attorney to sue that borrower, but the borrower filed bankruptcy.

"Plaintiffs then brought a legal malpractice case against Flaherty, which was dismissed for reasons not disclosed in the record. Following that dismissal, plaintiffs brought this legal malpractice and negligent misrepresentation case against defendant."

*Harkness,* 270 Or App at 262-67 (footnotes omitted).

To prevail on their legal malpractice and negligent misrepresentation claims against defendant, plaintiffs needed to prove a "case within a case"—that is, they were required to show, among other things, that, but for defendant's legal malpractice or negligent misrepresentation, they would have gone to trial in the underlying action, prevailed, and been awarded more than the amount that they had received in the settlement. *See Chocktoot v. Smith*, 280 Or 567, 570-71, 571 P2d 1255 (1977) (explaining case-within-a-case methodology). Plaintiffs' underlying action involved both contract and noncontract claims. For their case within a case on their contract claims, plaintiffs proceeded on a theory that Kantor had apparent authority from Sunset and Directors to bind those companies to the oral contract that was the basis for Kantor's investment scheme with plaintiffs—loaning funds to plaintiffs based on the equity in their different properties and then facilitating the lending of those funds to other borrowers for plaintiffs' investment

purposes. For their case within a case on their noncontract claims, plaintiffs pursued a *respondeat superior* theory that Sunset and Directors were vicariously liable as her employers for Kantor's actions, because Kantor had appeared to be acting within the scope of her employment.[2] Plaintiffs' apparent authority and *respondeat superior* theories were ultimately based on the same argument and evidence—*i.e.*, that Sunset and Directors had clothed Kantor with apparent authority to engage in the investment scheme with plaintiffs on behalf of the companies as part of her employment as a loan officer.

At the close of plaintiffs' case, defendant moved for a directed verdict on several grounds, including that plaintiffs could not have prevailed in the underlying action against Sunset and Directors. The trial court agreed, concluding that plaintiffs had failed to present any evidence of actual or apparent authority and, therefore, that they had not presented any evidence that would have allowed them to prevail at trial against Sunset or Directors. Based on that conclusion, the trial court granted a directed verdict to defendant.

On appeal, plaintiffs argued that they had presented sufficient evidence for a factfinder to draw an inference of apparent authority with respect to their contract claims and to draw an inference of *respondeat superior* with respect to their noncontract claims. Plaintiffs principally relied on this court's decision in *Badger v. Paulson Investment Co., Inc.*, 311 Or 14, 803 P2d 1178 (1991), in which this court held that, even though sales representatives of an investment company had actual authority to sell investors only approved securities, the representatives had apparent authority to sell unregistered securities.

The Court of Appeals affirmed the trial court's ruling that plaintiffs had not presented sufficient evidence of apparent authority to survive defendant's directed-verdict motion: "Plaintiffs presented no evidence that Kantor had

---

[2] Plaintiffs' noncontract claims were for negligence, conversion, fraud, violation of state mortgage brokerage laws, breach of fiduciary duty for any accounting, rescission, slander of title, and violation of state security laws. *Harkness*, 270 Or App at 268.

the apparent authority to give investment advice on behalf of either company, engage in the proposed investment scheme, or, for the contract claim, bind Sunset or Directors to the oral terms of that scheme." *Harkness*, 270 Or App at 272. In reaching that conclusion, the court disregarded the evidence related to Kantor arranging for plaintiffs to take out a conventional loan from Sunset and Directors and to those companies receiving a commission on those loans, "because those acts were within Kantor's actual authority as a loan officer for Sunset and Directors and are not evidence that Kantor had apparent authority to do more than just that." *Id*. The court then considered the remaining evidence and concluded that "[i]t was not objectively reasonable for plaintiffs to believe that that type of investment scheme [in which Kantor had engaged] was part of Kantor's job as a 'loan officer,' nor did Sunset or Directors provide any information to plaintiffs, whether directly or indirectly, that such a scheme or financial advice was part of Kantor's job." *Id*. at 273. The court also concluded that "[p]laintiffs' reliance on *Badger* to make their case is misplaced." *Id*.

We allowed review to determine whether the Court of Appeals properly applied this court's case law on apparent authority. More specifically, we allowed review to determine whether the Court of Appeals was correct that, in assessing whether a reasonable factfinder could infer that Kantor had apparent authority, the court was required to disregard all evidence relating to acts that were within Kantor's actual authority as a loan officer for Sunset and Directors. *Id*. at 272.

On review, plaintiffs argue that the Court of Appeals' reasoning "was based on both an unduly circumscribed view of the evidence in this case and an unduly circumscribed interpretation" of this court's decision in *Badger*. For his part, defendant argues that the Court of Appeals was correct in its view that the evidence in support of plaintiffs' theories of apparent authority and *respondeat superior* was insufficient. In particular, defendant argues that "there was insufficient evidence that Sunset and Directors had said or done anything to create the appearance that Kantor was authorized to act on their behalf as a financial advisor and

propose, and then carry out, an investment scheme involving the placement of private loans."

We begin with a brief discussion of Oregon law relating to the doctrine of apparent authority. This court recently summarized the legal principles applicable to a determination of when "a putative principal can be held responsible for the acts of another on an apparent agency theory" in *Eads v. Borman*, 351 Or 729, 277 P3d 503 (2012):

> "Classically, an agency relationship 'results from the manifestation of consent by one person to another that the other shall act on behalf and subject to his control, and consent by the other so to act.' *Vaughn v. First Transit, Inc.*, 346 Or 128, 135, 206 P3d 181 (2009) (emphasis in *Vaughn* omitted) \* \* \*. The agency relationship can arise either from actual consent (express or implied) or from the appearance of such consent. *See generally Taylor v. Ramsay-Gerding Construction Co.*, 345 Or 403, 410, 196 P3d 532 (2008) (so discussing). In either circumstance, the principal is bound by or otherwise responsible for the actual or apparent agent's acts only if the acts are within the scope of what the agent is actually or apparently authorized to do. *Id.*; *see also Beeson v. Hegsted*, 199 Or 325, 330, 261 P2d 381 (1953) (one cannot hold principal liable for an act that does not fall within the scope of agent's real or apparent authority).

> "\* \* \*. Under this court's settled cases, '[a]pparent authority to do any particular act can be created only by some conduct of the principal which, when reasonably interpreted, causes a third party to believe that the principal consents to have the apparent agent act for him on that matter.' *Jones v. Nunley*, 274 Or 591, 595, 547 P2d 616 (1976). There accordingly are two keys to the analysis: (1) the principal's representations; and (2) a third party's reasonable reliance on those representations."

*Id.* at 735-37 (internal quotation marks omitted).

This court also observed in *Eads* that the test in Oregon to determine when a principal is bound by an actor under an apparent authority theory is consistent with the rule stated in the *Restatement (Third) of Agency* section 2.03 (2006):

> "'Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third

parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations.'"

351 Or at 737 n 5 (quoting *Restatement (Third)* § 2.03). That test is applicable both "to determine when a principal is bound by actors who appear to be agents but are not, as well as actors who act beyond the scope of their actual authority." *Id.* (citing *Restatement (Third)* § 2.03 comment a).

Regarding the first element of the apparent authority test—a putative principal's representation that an agent is authorized to act on its behalf—an agent's actions, standing alone, will not give rise to apparent authority. *Id.* at 737 (citing *Taylor*, 345 Or at 410). Instead, the principal "must take some affirmative step in creating the appearance of authority, one that the principal either intended to cause or 'should realize' likely would cause a third party to believe that the putative agent has authority to act on the principal's behalf." *Id.* (ultimately quoting *Restatement (Second) of Agency* § 27 comment a (1958)). The principal's words, conduct, or other representation need not be made directly to or witnessed directly by the third party for the principal to be liable under a theory of apparent authority; rather, the representation of authority need only be *traceable* to the principal. *Id.*; *see Taylor*, 345 Or at 411 (indirect information attributed to principal's conduct "can be used to support apparent agency, as long as that information can be traced back to the principal"); *see also Restatement (Third)* § 1.03 comment b (although "the presence of actual authority depends upon whether the principal has made a manifestation to the agent," by contrast, "a manifestation sufficient to establish apparent authority may, but need not necessarily be, directed toward an identified person as its audience").[3]

---

[3] The *Restatement (Third)* describes a "manifestation" of authority by a putative principal in similarly broad terms. Section 1.03 notes that "[a] person manifests assent or intention through written or spoken words or other conduct," and the commentary to section 1.03 explains that "[a] manifestation is conduct by a person, observable by others, that expresses meaning. It is a broader concept than communication." *Id.* § 1.03 comment b; *see State v. Sines*, 359 Or 41, 55-56, __ P3d __ (2016) (citing section 1.03 and observing that "in determining whether agency exists, the emphasis is on 'manifestations' that can be assessed objectively").

Further, when a principal cloaks an agent with actual authority to perform certain tasks, that actual authority may create the appearance of authority to perform other, related tasks. *Taylor*, 345 Or at 411; *see Badger*, 311 Or at 26 (sales representatives' actual authority to sell approved securities lent weight to sales representatives' apparent authority to sell unregistered securities). Additionally, when a principal appoints an agent to a position that carries "generally recognized duties," a principal may create apparent authority to perform those duties. *Badger*, 311 Or at 24-25 n 9 (quoting *Restatement (Second)* § 27 comment a).

Regarding the second element of the apparent authority test—the third party's reasonable reliance—the third party must in fact rely on the principal's representation in dealing with the apparent agent, and that reliance must be objectively reasonable. *Eads*, 351 Or at 737 (citing *Jones*, 274 Or at 595-96; *Badger*, 311 Or at 26). In assessing the reasonableness of the third part's reliance, a court must consider what is customary and usual for certain positions or within certain professions. *Eads*, 351 Or at 737 n 5 ("Apparent authority also includes concepts of 'usual authority' and 'customary authority' in determining whether 'a substantial basis for a third party's belief' exists that the person with whom the third party dealt was acting as an agent for a principal in a particular circumstance.") (quoting *Restatement (Third)* § 2.03 comment b).

---

The *Restatement (Third)* commentary further explains that "an organization manifests its assent to be bound by the acts of individuals through the observable connections between the individual and the organization. An organization manifests assent to an individual by appointing that person to a position defined by the organization." *Id*. § 1.03 comment c. Moreover, the commentary emphasizes that the significance of manifestations by a putative principal must be understood in context:

"A manifestation does not occur in a vacuum, and the meaning that may reasonably be inferred from it will reflect the context in which the manifestation is made. Assent and intention may be expressed explicitly, but often they are inferred from surrounding facts and circumstances. For example, if an organization hires a person as its purchasing manager, the organization's act expresses assent that the person undertake the manager's role as defined by the organization."

*Id*. at comment e; *see Peoples Heritage Sav. Bank v. Pease*, 2002 ME 82, ¶¶ 20-21, 797 A2d 1270, 1276 (Me 2002) (genuine issue of material fact whether mortgagee's employee acted within apparent authority in negotiating terms with mortgagors to pay off loans).

We now turn to the Court of Appeals' analysis of whether a factfinder could reasonably infer that Kantor had apparent authority to bind Sunset and Directors to the loan transactions between plaintiffs and third parties. As noted, the court focused almost entirely on the nature of the "investment scheme"[4] perpetrated by Kantor as precluding a factfinder from drawing an inference of apparent authority, because "[i]t was not objectively reasonable for plaintiffs to believe that that type of investment scheme was part of Kantor's job as a 'loan officer[.]'" *Harkness*, 270 Or App at 273. However, in so narrowing its inquiry, the court disregarded, as irrelevant, the evidence concerning the actual authority with which Sunset and Directors had cloaked Kantor. Having disregarded that evidence, the court readily distinguished *Badger*, a case in which this court concluded that—under the circumstances presented—sales representatives with actual authority to sell approved securities were apparent agents with authority to sell unregistered securities.

Because both parties rely on *Badger*—and the Court of Appeals found *Badger* inapposite—we discuss it in some detail. *Badger* was a civil case for damages arising from the sale of unregistered securities to investors by representatives of an investment company. The investment company (Paulson) had taken over the investment accounts from a prior company (Slanker) and had informed customers that it had taken over the Slanker accounts. 311 Or at 17. Paulson's sales representatives, Lambo and Kennedy, who had previously worked for Slanker, then made sales presentations to those investors, and other investors, at Paulson's office and solicited sales of unregistered securities using Paulson's letterhead. The unregistered securities "proved to be valueless." *Id*. The investors brought claims against Paulson, Lambo, and Kennedy for securities fraud under ORS 59.115 and for common-law fraud. A jury entered a verdict against Paulson for damages on

---

[4] Although the court referred to Kantor's fraudulent scheme as an "investment scheme," we note that that scheme could just as accurately be referred to as a "loan scheme," or an "investment and loan scheme." Kantor advised plaintiffs that they could use the equity in their home to obtain "loans" from Sunset and Directors that could be "invested" by plaintiffs by making secure "loans" to developers and contractors.

all claims based on a finding that the representatives had apparent authority to bind Paulson to the sales. The trial court set aside the verdict for the investors against Paulson on the securities claims and a verdict against Paulson for punitive damages on the common-law claim. *Id.* at 18. The Court of Appeals reversed the trial court's judgment notwithstanding the verdict and reinstated those verdicts. *Id.* at 18-19.

On review, this court concluded that common-law agency principles may be invoked "to impose liability as a seller against a principal for an agent's violation" of the statutory requirements of ORS 59.115(1) and that "the evidence of an apparent agency relationship between Paulson and Kennedy and Lambo [was] sufficient to impose liability on Paulson" under that statute. *Id.* at 19. The court quoted from *Wiggins v. Barrett & Associates, Inc.*, 295 Or 679, 687, 669 P2d 1132 (1983), and cited the commentary to the *Restatement (Second)* section 27 for the principle that apparent authority may arise when an agent does not have actual or implied authority to act for a principal in a matter, but "the principal has clothed the agent with apparent authority to act for the principal in that particular. In other words, the principal permits the agent to appear to have the authority to bind the principal." *Badger*, 311 Or at 24 & n 9 (internal quotation marks omitted).

In reviewing whether the evidence was sufficient to support a finding that Kennedy and Lambo were "acting within the apparent authority of Paulson," this court discussed the fact that Kennedy and Lambo "were employed by Paulson as registered representatives" and that Paulson made it known to its customers that Kennedy was associated with Paulson:

> "When Kennedy went to work for Paulson, it sent its customers letters announcing Kennedy's association with Paulson. A second letter was sent a short time later to announce the assignment of Kennedy to several ongoing customer accounts. With these announcements, Paulson, who did not inform its customers of any limitations on Kennedy's authority to act for Paulson, conferred on Kennedy the authority to represent Paulson in securities sales and investment transactions.

"*****

"There is evidence that Paulson provided information intended to cause third persons to believe that Kennedy and Lambo were authorized to act for it in matters pertaining to the sale of securities, including meeting with customers, making sales presentations, sending mailings and handling paperwork. Although Paulson may have forbade its sales representatives to present or sell nonapproved securities, liability based on the agency principle of apparent authority may be imposed even though the principal expressly forbade the conduct in question. *See McClure v. E.A. Blackshere Company*, 231 F Supp 678, 685 (D Md 1964).

"There is also evidence that from the information provided to them by Paulson, the plaintiffs reasonably believed that Kennedy and Lambo were authorized to act for Paulson concerning the securities sold by Kennedy and Lambo to the plaintiffs. The investors testified to their reliance on this apparent authority."

*Badger*, 311 Or at 25-26. This court concluded that the evidence was sufficient "to support the jury's verdict that Kennedy and Lambo conducted the illegal sales with the apparent authority of Paulson." *Id.* at 26.

In this case, the Court of Appeals concluded that *Badger* did not aid plaintiffs. The court noted that, in *Badger*, the sales representatives had sold both authorized and unauthorized securities in the same manner and that the investment company had informed customers that the sales representatives were authorized to sell securities. *Harkness*, 270 Or App at 274. The court then contrasted those facts with this case, in which "neither Sunset nor Directors provided any information to plaintiffs from which they could reasonably conclude that Kantor was authorized by them to act as a financial advisor to, or engage in investment schemes with, its mortgage customers." *Id.*

We conclude, however, that the Court of Appeals made two missteps in determining that Sunset and Directors had made no manifestations from which plaintiffs could reasonably have concluded that Kantor was authorized to perform the acts constituting the fraudulent scheme. First, the court disregarded evidence concerning the actual authority

with which Sunset and Directors clothed Kantor. Second, the court does not appear to have considered evidence in the record relating to the usual or customary authority of a loan officer for a mortgage company.

As to the first misstep, this court's case law makes clear that the appearance of authority may, at least in part, be based on conduct relating to an agent's actual authority. *Taylor*, 345 Or at 411 ("[W]hen a principal clothes an agent with actual authority to perform certain tasks, the principal might create apparent authority to perform other, related tasks."); *Badger*, 311 Or at 26 (sales representatives had apparent authority to sell unregistered securities when they had actual authority to sell approved securities). That is so because, as noted, the rationale for the doctrine of apparent authority is that a principal must be held accountable for the results of reasonable third-party beliefs about an actor's authority to act as an agent based on manifestations that are traceable to the principal. One such manifestation is the actual authority with which the principal has cloaked an agent. Indeed, much of the commentary to section 1.03 and section 2.03 of the *Restatement (Third)* contemplates situations where an actor for a putative principal is an agent for the principal for other purposes. *See, e.g.*, *Restatement (Third)* § 2.03 comment d ("[A] third party should assess what is observed of the agent in light of the agent's position as a fiduciary with a duty to use authority on behalf of the principal."). Thus, evidence of an agent's actual authority to perform certain tasks is relevant to determining whether the agent was apparently authorized to perform other, related tasks, and the Court of Appeals erred in disregarding that evidence in this case.

As to the second misstep, the Court of Appeals does not appear to have considered the evidence in the record concerning the role of a loan officer for a mortgage company in the local industry. That evidence included excerpts from a deposition of Todd Johnson, Sunset's president, in which Johnson indicated that Sunset was a "mortgage finance provider" and a "mortgage broker" that used its own money and the money of others to make real estate loans and that Kantor was employed on a commission basis as a loan officer to originate loans. Johnson also testified

that there could be "a time that a hard money loan would be a benefit" as part of his "creative approach" to making loans, that a good loan officer could tell clients to utilize the equity in their real property to make money, and that his loan officers were encouraged to go out and find business. As we stated in *Eads*, apparent authority "includes concepts of 'usual authority' and 'customary authority' in determining whether 'a substantial basis for a third party's belief' exists that the person with whom the third party dealt was acting as an agent for a principal in a particular circumstance." 351 Or at 738 n 5 (citing *Restatement (Third)* § 2.03 comment b); *see also Taylor*, 345 Or at 413 (reasonable reliance on apparent authority where owner's general contractor testified that it was customary to obtain warranties in writing). Accordingly, evidence relating to Kantor's usual or customary role as a loan officer was relevant to the determination whether plaintiffs reasonably believed that Kantor had apparent authority, and that evidence should not have been disregarded by the Court of Appeals.

We now turn to the sufficiency of the evidence for a factfinder to infer that Kantor had apparent authority to bind Sunset and Directors to the loan transactions arranged by Kantor between plaintiffs and third parties. We review the grant of a directed verdict against a party in the light most favorable to that party—here, the plaintiffs—and we draw all inferences from the evidence in plaintiffs' favor. *Trees*, 354 Or at 200.

The record in this case includes evidence that Kantor was employed successively by two mortgage companies, Sunset and Directors, as a "loan officer" during a period of time when Kantor defrauded plaintiffs by use of an investment or loan scheme. The scheme consisted of Kantor advising plaintiffs to take out conventional loans from Sunset and Directors using the equity in their home as collateral and using the proceeds to make hard-money loans to contractors and developers as arranged by Kantor. Unbeknownst to plaintiffs, and contrary to Kantor's representations, those loans by plaintiffs were not secured, and Kantor retained some of the proceeds from those loans for her own benefit. Kantor used Sunset and Directors offices, letterhead, and

staff in the presence of plaintiffs during this period of time. Neither mortgage company informed plaintiffs of any limitations on Kantor's authority as a "loan officer" to act for those companies in matters pertaining to loans or financial investment. As noted, Sunset's president, Johnson, testified that Sunset was a "mortgage finance provider" and a "mortgage broker" and that Kantor was employed on a commission basis as a loan officer to originate loans. Johnson also testified that a good loan officer could tell clients to utilize the equity in their real property to make money and that his loan officers were encouraged to go out and find business. Finally, Mrs. Harkness testified that she would not have entered into the loan transactions if Kantor had not been working with Sunset and Directors and that she believed that Kantor had been acting within the scope of her employment in all of her dealings with plaintiffs.

Viewing that evidence in the light most favorable to plaintiffs, we conclude that a reasonable factfinder could infer that Sunset and Directors manifested their assent to be bound by the acts of Kantor through the observable connections between Kantor and those organizations. *Restatement (Third)* § 1.03 comment c. As we have explained, a factfinder in this case could consider all of the relevant conduct of Sunset and Directors in the context of those organizations having hired Kantor as a "loan officer," given Kantor actual authority to perform the tasks of a loan officer, and placed her in their offices without notice to customers of any limitation on her authority or fiduciary duties as a loan officer. Under those circumstances, a factfinder could infer that Sunset and Directors manifested their assent to be bound to the loan transactions between plaintiffs and third parties arranged by Kantor. *Taylor*, 345 Or at 410-11; *Badger*, 311 Or at 24-25; *Restatement (Third)* § 2.03.[5]

---

[5] Defendant's argument that Sunset and Directors did nothing to create the appearance of authority for Kantor to act "as a financial advisor and propose, and then carry out, an investment scheme involving the placement of private loans" misses the mark. Plaintiffs do not seek to hold Sunset and Directors liable under an apparent authority theory for Kantor's financial advice. Rather, plaintiffs seek to bind Sunset and Directors to the loan transactions arranged by Kantor. The evidence that we have recited provides a basis for a factfinder to draw an inference that Kantor—as a "loan officer" hired by Sunset and Directors—was authorized to facilitate the receipt of loans to plaintiffs from those companies and to arrange for plaintiffs to make loans to third parties.

We further conclude that a reasonable factfinder could infer from the evidence that it was reasonable for plaintiffs to believe that Kantor was authorized—as a loan officer for Sunset and Directors—to engage in the investment and loan scheme on behalf of those companies. In particular, a factfinder could infer that plaintiffs reasonably believed that Kantor's actions were part of her usual or customary authority as a loan officer hired by Sunset and Directors to make and arrange loans on behalf of the mortgage companies. *See Eads*, 351 Or at 738 n 5 (concepts of "usual authority" and "customary authority" help inform determination whether third party's reliance was reasonable).

Additionally, we find the *Restatement (Third)* commentary instructive on the question of the reasonableness of plaintiffs' belief. Comment d to section 2.03 notes that, where "a third party knows that the actor in question is an agent and knows the identity of the principal, the third party should assess what is observed of the agent in light of the agent's position as a fiduciary with a duty to use authority on behalf of the principal." *Restatement (Third)* § 2.03 at comment d. With respect to particular transactions, such as the loan transactions in this case, a third party should consider whether it appears to be reasonably related to the principal's known business. *Id.* "Absent circumstances that should raise questions in the mind of a reasonable third party, as a general matter there is no requirement that the third party inquire into the scope of an agent's authority." *Id.* Here, plaintiffs knew that Kantor was an agent of Sunset and Directors and observed Kantor in light of her position as a fiduciary with a duty to use authority on behalf of Sunset and Directors. Under the circumstances described above, plaintiffs could reasonably have believed that all the loans were reasonably related to Sunset's and Directors' business, and that Kantor was acting within her fiduciary duty as a "loan officer."

Finally, we consider plaintiffs' argument that the trial court erred in granting defendant's motion for a directed verdict on plaintiffs' noncontract claims under a theory of *respondeat superior*. The Court of Appeals did not reach plaintiffs' argument that the trial court failed to determine the vicarious liability of Sunset and Directors on

those claims, because, in its view, plaintiffs did "not raise or develop any legal arguments as to how [the] evidence meets the *respondeat superior* elements." *Harkness*, 270 Or at 271 n 6. We disagree. In their brief on appeal, plaintiffs argued,

"The trial court in this case conflated the concept of respondeat superior liability for tort claims with the concept of apparent authority that applied to the breach of contract claims in the *Kantor* lawsuit, although the Harnesses' trial counsel pointed out the difference. As a practical matter, however, it only makes a potential difference with respect to the second element for respondeat superior liability—that the employee must have been motivated, at least partially, by a purpose to serve the employer—which is not part of the test for apparent authority. The evidence for the first and third elements—that the conduct must have occurred substantially within the time and space limits authorized by the employment, and the act must have been of a kind that the employee was hired to perform—is the same as the evidence for Kantor's apparent authority discussed above with respect to the breach of contract claim.

"The evidence for the second element of respondeat superior liability is, however, present in the fact that Kantor persuaded the Harknesses to obtain the funds which she would then purportedly lend to other borrowers by taking out loans from Sunset and Directors, using their equities in first their residence and then a rental house that they owned as collateral. A jury could find that these loans to the Harknesses, which Kantor arranged in her capacity as a loan officer with first Sunset and then Directors, had a partial purpose to benefit, and did benefit, those two employers.

"Because of these flaws in the trial court's analysis, it never addressed the substance of the Harknesses['] other claims alleged against Kantor, Sunset, and Directors in the *Kantor* lawsuit. The evidence summarized in the Summary of Facts, above, established most, if not all of those claims as they were alleged in the Second Amended Complaint in that case."

(Record citations omitted.)

We conclude that plaintiffs sufficiently developed their argument on appeal that the trial court failed to determine the vicarious liability of Sunset and Directors

on plaintiffs' noncontract claims, and we therefore reach that argument. Again, on review of the grant of defendant's motion for a directed verdict, we view the evidence and draw all reasonable inferences in plaintiffs' favor. *Trees*, 354 Or at 200. Based on the evidence we have discussed in relation to plaintiffs' theory of apparent authority, we also conclude that a factfinder could infer that the requirements for holding an employer vicariously liable under the doctrine of *respondeat superior* are met in this case.

This court has summarized those requirements as follows:

"Under the doctrine of *respondeat superior*, an employer is liable for an employee's torts when the employee acts within the scope of employment. Negligence or other tortious conduct by the *employer* is not required. * * *

"Three requirements must be met to conclude that an employee was acting within the scope of employment. These requirements traditionally have been stated as: (1) whether the act occurred substantially within the time and space limits authorized by the employment; (2) whether the employee was motivated, at least partially, by a purpose to serve the employer; and (3) whether the act is of a kind which the employee was hired to perform."

*Chesterman v. Barmon*, 305 Or 439, 442, 753 P2d 404 (1988) (citation omitted).

In this case, based on the same evidence that plaintiffs presented regarding apparent authority, a reasonable factfinder could infer that the above three requirements have been met:

(1)   Kantor's acts occurred substantially within the time and space limits authorized by the employment;

(2)   Kantor's conduct as a "loan officer" in loaning funds to plaintiffs based on the equity in their different properties and then facilitating the lending of those funds to other borrowers for plaintiffs' investment purposes was motivated, at least in part, by a purpose to serve her employers, and

(3)   Kantor's conduct described above was a kind that Kantor was hired to perform as a "loan officer." In

particular, and as previously described, there was evidence that Sunset was a "mortgage finance provider" and a "mortgage broker" and that Kantor was employed on a commission basis as a loan officer to originate loans. Sunset's president, Johnson, also testified that a good loan officer at Sunset could tell clients to utilize the equity in their real property to make money.

Thus, the trial court erred in allowing defendant's motion for directed verdict on plaintiffs' theory of *respondeat superior. See Stanfield*, 284 Or 651, 655, 588 P2d 1271 (1978) ("question of whether or not an employee has acted within the scope of his employment at any given time is normally a question for the jury, except in cases where only one reasonable conclusion can be drawn from the facts").

We conclude, then, that the trial court erred in allowing defendant's motion for a directed verdict and that the Court of Appeals erred in affirming that decision. Accordingly, we remand to the trial court for further proceedings consistent with this opinion.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.